DORIS JEAN HOLLEMAN, PLAINTIFF v. CLAYTON HOLMES AIKEN, ET AL.,
DEFENDANTS

No. COA07-1425

(Filed 4 November 2008)

**1. Civil Procedure— Rule 12(b)(6)—plausibility standard—not adopted**

The plausibility standard for deciding Rule 12(b)(6) motions has not been adopted in North Carolina, and the Court of Appeals does not have the authority to adopt a new standard.

**2. Libel and Slander— libel per se—statements about book— claim properly dismissed**

The trial court correctly granted a Rule 12(b)(6) motion to dismiss an action for libel per se by an author who had written a book about a performer where the performer's mother stated that they were not close personal friends with plaintiff and had not authorized the book. The complaint itself demonstrates the truth of some of the statements and, even if the statements are false,

they do not impeach plaintiff in her profession or tend to disgrace and degrade her, hold her up to public ridicule, or otherwise constitute libel per se.

**3. Libel and Slander— libel per quod—statements about book—not defamatory**

The trial court correctly granted a Rule 12(b)(6) motion to dismiss an action for libel per quod by an author who had written a book about a performer where the publications in issue from the performer's mother were simply that none of the defendants are affiliated with plaintiff and that none of the defendants or their close friends endorsed plaintiff's book. Even considering innuendo, colloquium, and explanatory circumstances, none of the publications are defamatory.

**4. Contracts— tortious interference—unauthorized celebrity book—statements denying affiliation—claim not stated**

The trial court correctly granted a Rule 12(b)(6) motion to dismiss an action for tortious interference with business relationships brought by the author of a book about a performer where the performer's mother denied affiliation with plaintiff or that the book was authorized. The complaint did not state the existence of a valid contract and did not allege that defendants had actual knowledge of the contract or intentionally induced nonperformance. As to eBay sales, the complaint specifically says that her account was suspended because she was illegally selling DVDs and CDS.

**5. Emotional Distress— intentional and negligent—statements about book—claim not stated**

The trial court correctly granted a Rule 12(b)(6) motion to dismiss claims for intentional infliction of emotion distress and negligent infliction of emotional distress arising from statements by a performer's mother that plaintiff was not a close acquaintance and that plaintiff's book was not endorsed by defendants. There were no allegations of negligence or extreme or outrageous conduct, and no specific allegations of the nature of plaintiff's severe emotional distress.

**6. Injunctions— compel book promotion—not within scope of relief**

The trial court did not err by granting defendants' Rule 12(b)(6) motion to dismiss a request for a mandatory injunction

requiring promotion of a book and retraction of defamatory statements. A mandatory injunction cannot be granted to require endorsement and promotion of a book, and the statements in issue were not defamatory.

**7. Assault— civil battery—bodyguard grasping arm—claim sufficiently stated**

The trial court erred by granting a Rule 12(b)(6) motion to dismiss a civil battery claim against a performer where his bodyguard was alleged to have grasped plaintiff's arm to move plaintiff away from defendant. Plaintiff alleged an offensive touching without her consent, and vicarious liability by defendant as the bodyguard's employer.

**8. Assault— civil battery—bodyguard's actions—vicarious liability of corporation**

The trial court did not err by granting defendants' Rule 12(b)(6) motion to dismiss vicarious liability battery claims against a performer's corporations and charitable foundation arising from a bodyguard's actions in the performer's presence. Plaintiff did not plead facts indicating that the performer was acting within the scope of his duties for the foundation rather than on his own behalf.

**9. Appeal and Error— preservation of issues—brief—failure to cite authority—argument waived**

Plaintiff's failure to cite legal authority on appeal resulted in abandonment of her argument concerning dismissal of alter ego claims against a performer's corporations and charitable foundation arising from the actions of a bodyguard.

**10. Assault— civil battery—punitive damages—claim sufficiently stated**

Plaintiff's allegations of willful and wanton conduct were sufficient to state claims against a performer for punitive damages as to civil battery arising from the actions of the performer's bodyguard, and the trial court should not have dismissed that claim.

**11. Appeal and Error— preservation of issues—brief—authority not cited—argument abandoned**

Plaintiff abandoned an argument on appeal concerning civil conspiracy by not citing legal authority to support her argument.

**HOLLEMAN v. AIKEN**

[193 N.C. App. 484 (2008)]

Appeal by plaintiff from order entered 18 July 2007 by Judge Ronald L. Stephens in Superior Court, Wake County. Heard in the Court of Appeals 19 August 2008.

*Arlaine Rockey, for plaintiff-appellant.*

*Nelson Mullins Riley & Scarborough LLP, by Matthew P. McGuire and Joseph S. Dowdy, for defendant-appellees.*

STROUD, Judge.

According to the amended complaint filed in this action, plaintiff is an author who has written a book about singer Clay Aiken ("Mr. Aiken"). Most of plaintiff's claims arise out of her publication of a book about Mr. Aiken and her hope to have Mr. Aiken, as well as his mother and close friends, endorse and promote her book. Plaintiff has sued Mr. Aiken and other defendants, on various legal theories, based primarily upon their refusal to endorse her book. In addition to requests for compensatory and punitive damages, plaintiff asked the court to issue a mandatory injunction, requiring Mr. Aiken and other individuals to endorse, promote, and even assist in selling her book. For the reasons as stated below, we affirm the dismissal of these claims. Our courts cannot be used to force celebrities or their family or friends into making endorsements for another person's profit.

Unrelated to her claims regarding her book, plaintiff also alleged two claims for battery, both arising out of an encounter between Mr. Aiken's bodyguard and plaintiff, when the bodyguard sought to remove plaintiff from a chair next to Mr. Aiken. For the reasons as stated below, we reverse the order dismissing the battery claims only as to Mr. Aiken.

Plaintiff appeals the trial court order granting defendants' motion to dismiss pursuant to North Carolina Rule of Civil Procedure 12(b)(6). The dispositive question before this Court is whether the trial court erred in concluding that plaintiff failed to state any claim against any defendants upon which relief could be granted. For the reasons stated below, we affirm in part and reverse in part the trial court's order dismissing plaintiff's claims.

## I. Background

On or about 3 August 2006, plaintiff filed a voluminous verified complaint against defendants. On 15 November 2006, defendants filed a motion to dismiss for "[f]ailure to state a claim upon which relief

can be granted" pursuant to North Carolina Rule of Civil Procedure 12(b)(6) and a motion to strike several of plaintiff's allegations in her complaint pursuant to North Carolina Rule of Civil Procedure 12(f). On 2 January 2007, plaintiff filed a verified amended complaint.[1] Plaintiff's amended complaint alleges:[2]

6.  The Defendant The Bubel Aiken Foundation ("BAF"), is a charitable organization . . . .

7.  The Defendant Fifty2thirty Entertainment, LLC, ("Entertainment LLC") is a North Carolina, for-profit corporation . . . .

8.  Upon information and belief, Defendants Fifty2thirty Merchandising, Inc., ("Merchandising, Inc."), Fifty2thirty Productions, Inc. ("Productions, Inc."), Fifty2thirty Music ("Music"), Fifty2thirty, LLC ("Fifty2thirty"), Fifty2thirty Publishing ("Publishing"), and Fifty2thirty Touring, Inc. ("Touring, Inc.") (together formerly referred to as the "John Doe Corporations in the Plaintiff's Complaint) are each for-profit corporations, incorporated by or on behalf of Aiken, and in each, Aiken is an officer and majority shareholder; (Collectively, together with Entertainment, LLC, hereinafter referred to as the "Fifty2thirty Corporations");

. . . .

13. The Plaintiff is the author of the book, *Out of the Blue . . . Clay it Forward—How One Man & His Fans Are Changing The World* ("*Out of the Blue*"), that was published in or about January, 2006 in the United States;

14. Aiken is a popular, internationally-known, multi-platinum, RCA recording artist, professional singer, and entertainer who began his successful career as the runner-up on the second *American Idol* television competition series in 2003;

15. Parker is Aiken's mother;

---

1. The record contains no order permitting amendment to plaintiff's complaint nor any ruling upon defendants' motion to strike. However, no party has argued that the court improperly considered the amended complaint. We therefore assume that plaintiff filed the amended complaint with defendants' tacit consent, in response to defendants' motion to strike, which specifically requested that plaintiff be required to file an amended complaint.

2. The amended complaint is 68 pages in length, with an additional 9 page exhibit. Due to the length of the complaint, we will discuss the specific allegations regarding plaintiff's various claims within our analysis.

16. Wilson is one of Parker's close friends, and Wilson has been treated like extended family by Aiken and Parker;

. . . .

64. Plaintiff's parents were close friends with Amaryllis McGhee ("Amaryllis") and her late husband, Roscoe McGhee ("Roscoe"), who have two daughters, Joan Marbrey ("Joan") and Donna McGhee ("Donna") (collectively, "the McGhees");

. . . .

104. Plaintiff hired Aiken to sing at her daughter's wedding that occurred on May 19, 2001;

. . . .

109. After Aiken went on *American Idol,* Plaintiff had a shortened version of Plaintiff's daughter's wedding video with Aiken singing one song put on DVD; and Plaintiff registered it with the U.S. copyright office (hereinafter referred to as the "Wedding DVDs");

110. Until recently, Plaintiff believed in good faith that she owned the copyright to the Wedding DVDs as a work-for-hire derivative work; however, she recently learned, that because she did not have an explicit, written, work-for-hire contract signed by Aiken in advance, the copyright laws did not protect her;

111. During late 2003, 2004 and in early 2006, Plaintiff placed the Wedding DVDs on eBay<sup>TM</sup>. to sell them initially during a time that she was ill with no insurance and was unable to work;

. . . .

115. It was by selling and giving away the Wedding DVDs that Plaintiff initially met online and subsequently became friends with many Aiken Fans all over the country, actually visiting with some of them, which in turn inspired Plaintiff to write *Out of the Blue*;

. . . .

118. Plaintiff sold four (4) CDs that she had burned as copies of Aiken's pre-American Idol CD, "redefined," in 2003 on

EBay$^{TM}$., with a clear description that they were copies, for a total of about $70;

. . . .

122. Plaintiff spent over two years writing *Out of the Blue*, which is a 564 page book, containing, *inter alia*, background information about Aiken's life, Plaintiff's life, and Plaintiff's experiences growing up with and close friendship with the McGhee family and containing memories of Plaintiff Amaryllis, Joan, and Donna about Aiken, as well as stories (all non-fiction except for one fiction piece clearly marked as such in Chapter Nineteen) by Aiken's Fans[.]

Plaintiff brought claims for libel *per se*, libel *per quod*, tortious interference with business relationships, intentional infliction of emotional distress, negligent infliction of emotional distress, injunctive relief, and battery. Plaintiff also claims defendants have civilly conspired against her as to each cause of action. Throughout the complaint, plaintiff has conflated various legal theories and made conclusory allegations that each and every defendant is liable for each and every act of every other defendant without alleging any factual basis for most of the claims. As to all of her causes of action, except injunctive relief, plaintiff claims she is entitled to compensatory and punitive damages.

On 23 January 2007, defendants filed motions to dismiss and to strike certain allegations in plaintiff's amended complaint and "plaintiff's briefs in opposition to defendants' motion to dismiss." On 18 July 2007, the trial court granted defendants' motion to dismiss because "[p]laintiff's Amended Complaint fails to state a claim against any of the Defendants upon which relief may be granted." Plaintiff appeals. The dispositive question before this Court is whether the trial court erred in concluding that plaintiff failed to state a claim against any defendant upon which relief could be granted. For the following reasons, we affirm in part and reverse in part.

II. North Carolina Rule of Civil Procedure 12(b)(6)

Plaintiff claims that her "verified Amended Complaint is detailed and alleged sufficient facts to meet all the legal elements of each cause of action to withstand the Motion to Dismiss[.]"

A. Standard of Review

[1] Plaintiff argues that this court should apply the "plausibility standard" as set forth in *Bell Atlantic Corp. v. Twombly*, —— U.S. ——,

——, 167 L. Ed. 2d 929 (2007). Plaintiff has also correctly noted that "[t]o date, North Carolina has not adopted the 'plausibility standard' set forth in *Bell Atlantic* for 12(b)(6) Motions to Dismiss[.]" This Court does not have the authority to adopt a new standard of review for motions to dismiss. *See Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). Instead, we use the following standard, which is the correct standard of review as used by the North Carolina appellate courts:

> On a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the standard of review is whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory. The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief.

> This Court must conduct a *de novo* review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct.

*Craven v. SEIU Cope*, 188 N.C. App. 814, 816, 656 S.E.2d 729, 731-32 (2008) (citations and quotation marks omitted).

B. Libel *Per Se*

Plaintiff contends she has a valid claim of libel *per se* arising from four different publications made by Ms. Parker.[3] The four publications plaintiff challenges are:

1. Parker's 22 August 2005 Publication

194. On or about August 22, 2005 on several Aiken fan message board websites, the following message was published by or caused to be published by Parker:

"Out of the Blue', by Jeannie Holloman (sic), is not an authorized book by Clay Aiken, his family or good friends

---

3. We quote the alleged defamatory statements in their entirety and unaltered; this includes their original errors and emphasis of the statements which plaintiff contends are defamatory.

the McGhees, whom we consider extended family. It is more fiction than truth and Miss Holloman did not know me or Clayton when he was young nor was she raised by Amaryllis. My understanding is that the book is a collection of fan stories and that Jeannie has colored it up with tales of knowing Clayton to sell the book. At least that is what her own biography says. Please know that if you buy the book the only mention of him that is truth is that he did sing at her daughter Natalie's wedding, but her sister Julie is the one who hired him. He does not know Jeannie Holloman in any way.

Thank you all for supporting my son and his foundations in the proper ways.

Clay's mom,

Faye Parker

[Hereinafter referred to as the "Parker Disclaimer"][underlining supplied];

2. Parker's 24 September 2005 Publication

254. On September 24, 2005 Parker forwarded (published) Joan's email, that included the McGhee Disclaimer, to Plaintiff's Book Editors (third parties), after which was the first time Plaintiff knew about this McGhee Disclaimer, Parker's email to Plaintiff's Book Editors read as follows:

obviously (sic) you and Miss Holloman (sic) did not see this disclaimer that was posted by the McGee family stating that the[y] did not want their names used in anyway to promote this book so I am sending you a copy and you may send to Miss Holloman (sic).

Also in speaking with my son [Aiken] and his attorney [upon information and belief, Parker is referring to Aiken's attorney] she [Plaintiff] does not have the permission to use his likeness in any way including the picture. [Parker included the September 4, 2005 email from Joan to Parker set forth hereinbelow] [bracketed information and underlining supplied]

Rather than have you to send me the email address it may be easier for me to just send the disclaimer to

you. If you will just forward it to whoever needs to post it on the board.

Thanks, Joan

POST TO THE WEBSITES:

September 4, 2005

Jeannie Holleman was not raised by Amaryllis McGhee nor is she a close friend of Faye Parker. To our knowledge, the first time she ever met Faye was 1994 and Clayton Aiken in 2001. Amaryllis was not aware that Jeannie's book was going to be based on her memories of Clayton and put on the Internet and published. Jeannie does not have her blessings as she states on the book cover or the authorization to use the McGhee family to promote her book.

Amaryllis, Donna and Joan McGhee

[The September 4, 2005 statement above is referred to herein as the "McGhee Disclaimer"][underlining supplied].

3. Parker's 26 September 2005 Publication

264. On September 26, 2005, Parker wrote an email response to Plaintiff's undersigned counsel and also published it to, by sending a copy to, Joan [underlining supplied], set forth in part as follows:

i (sic) agree that the book is positive. What I don't' agree with is that Miss Holleman (sic) did not know my son as a child and if you would like to speak with the McGhee's, her claims of growing up in their house and being family with them are false. The only truth I can find is that Donna and her sister were friends. That her brother Mike was at the McGhee's a lot. Jeannie has picked Amaryllis brain and used her memories as her own in claims of growing up knowing my son. My son did not ever know who Jeanne (sic) was when she was in Hawaii forcing herself into family pictures. She has been told not to claim knowing him in any way.

Furthermore, my disclaimer was not an harrassment (sic) nor was the other disclaimer. I believe posting on the boards is not considered a harrassment (sic) otherwise there is a lot

of that going on. <u>I have people emailing me saying Jeanne (sic) told them she just got off the phone with me and other claims that are not valid.</u> . . . If there is any problem it is from <u>Miss Holleman (sic) deceiving the fans to sell a book of their own stories they can find on the Internet To endorse the book she makes untrue claims of knowing Clayton.</u> If you read the McGhee's disclaimer <u>she met him about 2000 or thereabouts and he was hired by her sister for the wedding.</u>

. . . .

. . . . I am forwarding a copy of my response to the McGhees.

Sincerly (sic) yours

Faye

[Hereinafter referred to as "Parker's email to Plaintiff's counsel"];

4. Parker's 7 October 2005 Publication

275. Upon information and belief, on October 7, 2005, Parker wrote and published the following email to a third party, whose name was disclosed to Defendants in Plaintiff's deposition [underlining supplied]:

I would like to put the record straight on the book "Out of the Blue" I understand that you posted something claiming I made an announcement proclaiming that the book was positive and made it look like I had endorsed the book. So for the record here is my report. I did place a disclaimer which could have been misinterpreted, as I re read it. I did not claim that the fans were lying. My claim was that <u>the remarks made about relationships with my son as a child were not truths and that the McGhee's did not raise the author. She never was around my son as he was growing up</u> and I have the McGhee's to verify that. My claim was <u>this was fictional to sell the book</u>. I do not know what the fans have written except the ones who have sent me letters and they were inspirational in how my son had helped them to overcome times in their lives when things were not going the best. I do not question any of that. I am happy that they could be inspired by anothers (sic) life. Unfortunately anything he or I say is dissected over and over again until it comes out entirely different from what we actually said.

Like the childhood game of gossip. Those fan stories, I am sure are the positive part of the book. That still does not mean I endorse the book and the use of my name to sell it. The author has been sent letters from the attorney about this several times. The McGhee's do not endorse or give their blessings and most certainly does my son not do that.

In fact, I almost feel ridiculous in trying to explain this to you as I know that Miss Holleman posts under many different names trying to convince people she has support when in fact it is her so I am not sure this is not her either. I find it a little amusing your email since I too am an interior designer. I am coping (sic) the McGhee's on this also.

Faye Parker

5. Analysis

[2] Upon a thorough review of plaintiff's amended complaint and considering the allegedly libelous statements individually as well as cumulatively, *see Nucor Corp. v. Prudential Equity Group, LLC*, 189 N.C. App. 731, 736, 659 S.E.2d 483, 487 (2008), it appears that the overall import of all of the allegedly libelous statements is that neither Mr. Aiken nor his mother are close personal friends of plaintiff, nor do they or their close personal friends endorse or authorize plaintiff's book. Plaintiff claims that these statements are false, because she believes she had a closer personal acquaintance with Mr. Aiken and Ms. Parker than they acknowledge. Plaintiff also alleges that Amaryllis McGhee ("Ms. McGhee") gave her "blessing" for the book before it was completed, but ultimately Ms. McGhee and other defendants refused to endorse the book. In some instances, we must engage in convoluted logic to discern what plaintiff is claiming is false, much less defamatory. The gist of plaintiff's libel *per se* is that she believed, while she was writing her book, that Ms. McGhee in particular would endorse it, but ultimately neither Ms. McGhee nor other defendants did so.

Our law as to plaintiff's claim of defamation is that

[i]n order to recover for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person. The term defamation applies to the two distinct torts of libel and slander.

North Carolina law recognizes three classes of libel: (1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*.

*Craven* at 816-17, 656 S.E.2d at 732 (citations and quotation marks omitted).

Libel *per se* is a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

Defamatory words to be libelous *per se* must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided.

Although someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact. This Court considers how the alleged defamatory publication would have been understood by an average reader. In addition, the alleged defamatory statements must be construed only in the context of the document in which they are contained, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The articles must be defamatory on its face within the four corners thereof.

*Nucor Corp.* at 736, 659 S.E.2d at 486-87 (citations, quotation marks, and brackets omitted).

We first note that truth is a defense to a libel claim. *See, e.g., Martin Marietta Corp. v. Wake Stone Corp.*, 111 N.C. App. 269, 276, 432 S.E.2d 428, 433 (1993), *aff'd per curiam*, 339 N.C. 602, 453 S.E.2d 146 (1995). Normally we do not consider defenses at this preliminary stage, *see Craven* at 816, 656 S.E.2d at 731; however, as to some of the alleged statements, the complaint itself demonstrates the truth of the allegedly libelous statements. Plaintiff alleges that the statement,

**HOLLEMAN v. AIKEN**

[193 N.C. App. 484 (2008)]

"Jeannie does not have her [,Ms. McGhee's,] blessings as she states on the book cover or the authorization to use the McGhee family to promote her book" is a defamatory statement. However, it is abundantly obvious from the complaint itself that this statement is true, as presumably plaintiff would not otherwise have requested issuance of a mandatory injunction "that Aiken, Parker and Wilson shall encourage, request, and allow the McGhees to publicly endorse" her book. Thus, from plaintiff's own complaint it is clear that some of the alleged defamatory statements are true. As plaintiff was asserting that Ms. McGhee endorsed her book, but Ms. McGhee did not endorse it, the statements issued by defendants that plaintiff is untruthful, in this regard, would also be protected by a "truth" defense.

In addition, plaintiff alleges that it was defamatory for Parker to publish that plaintiff was not raised by Ms. McGhee, but plaintiff's complaint alleges that "Amaryllis helped rear Plaintiff (meaning in the context of the saying 'It takes a village to raise a child')[.]" The common understanding of the statement that a person "raised" or "reared" a child is that the person filled the role of a parent to the child and probably resided in the same home with the child. Plaintiff's own complaint reveals that Ms. McGhee did not "raise" or "rear" plaintiff in any commonly understood sense of the word.

However, even if we make the generous assumption that all of the allegedly defamatory statements noted by plaintiff are false statements of fact, they still do not constitute libel *per se*. As the allegedly libelous statements obviously do not charge that plaintiff "committed an infamous crime" or that she has "an infectious disease[,]" the statements could be libelous *per se* only if they tend to impeach plaintiff in her trade or profession or if they otherwise tend to subject her "to ridicule, contempt or disgrace." *Id.* at 736, 659 S.E.2d at 486. All of the statements generally convey that defendants have no affiliation with plaintiff, that Aiken and Parker's close friends have not endorsed plaintiff's book, and that some of the defendants consider some of plaintiff's claims in the book to be false. Plaintiff has failed to demonstrate why these statements would be libelous *per se*. Certainly many successful books about famous persons such as Mr. Aiken, even biographies, are published without the authorization or endorsement of the person who is the subject of the book or that person's family or close friends or even over the objections of these persons. We do not conclude that any of these allegedly defamatory statements taken individually or as a whole impeach plaintiff in her profession or "tend to disgrace and degrade . . . [plaintiff] or hold h[er] up to public

hatred, contempt or ridicule, or cause h[er] to be shunned and avoided" as a matter of law. *Id.* These arguments are overruled.

## C. Libel *Per Quod*

**[3]** Plaintiff next claims she has valid claims for libel *per quod* as to the four publications *supra* and two additional publications by Parker. The two additional publications are:

### 1. Parker's 27 August 2005 Publication

202. On August 27, 2005, to Plaintiff's Book Editors' surprise, Parker personally wrote Plaintiff's Book Editors an email responding to their foregoing Internet post; Parker's email was not invited, and Plaintiff's Book Editors had no reasonable expectation when posting the above Internet post that Parker would personally contact them in response to their Internet post; In said email Parker wrote to Plaintiff's Book Editors, in which the underlined portions are false statements, *inter alia,* [bracketed information, underlining, italics, and emphasis supplied]:

**Subject:** Jeannie Holleman's Out of the Blue

I think you are questioning the fact that the disclaimer posted on the website came from me. **It was in fact my disclaimer** and was put there for obvious reasons because <u>Miss Holleman</u>, and I spelled it correctly this time, <u>has obviously spoken to too many people</u> claiming connections and friendships and <u>pretending to have taken care of Clayton as a child.</u> Too many people have come forward with information that they would not have made up. They were not telling it to cause trouble but thought they were speaking with someone that was really a close friend. The McGhee's have been friends of ours from before the time Clayton was born. . . .

*Also, the McGhee's are adding a disclaimer stating that they have not approved any of the information and have not given blessings to the book as Miss Holleman claims. . . .*

Miss Holleman has been removed from E bay several times for bootlegging copies of a wedding where my son sang, without his permission, and for selling copies of his CD that were downloaded.

. . .

**HOLLEMAN v. AIKEN**

[193 N.C. App. 484 (2008)]

If you read the disclaimer again I did not say anything bad about Miss Holleman. I only stated the fact that her claim to know us was to sell the book. . . .

I may forward this open letter [upon information and belief, Parker is referring to Plaintiff's Book Editors' open letter above] to the attorney [upon information and belief, Parker is referring to Aiken's attorney]. **When I told him I was making the disclaimer he said ok and he would take care of the rest.**

Faye Parker . . .

I will also be glad to forward you the scuttlebutt that originated on the website because of this open letter [upon information and belief, Parker is referring to Plaintiff's Book Editors' open letter above]. It does not make your company look very good. . . .

I am looking forward to your comment. If you did not do this [upon information and belief, Parker is referring to Plaintiff's Book Editors' open letter above] and know who did I will try to help restore your reputation. [Hereinafter referred to as "Email to Plaintiff's Book Editors"];

2. Parker's 25 September 2005 Publication

260. On September 25, 2005, Parker sent the McGhee Disclaimer by email to Plaintiff, and published this email to, by sending a copy to, Joan, with the following prefatory remarks: "<u>The McGhee's placed a disclaimer Sept. 4th, 2005 not to use them in anyway to promote your book.</u> I am sending you a copy. It is sad that <u>you have to use people you call friends without their approval.</u>" [underlining supplied];

3. Analysis

Libel *per quod* is defined as "publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous . . . ." *Craven* at 736, 656 S.E.2d at 732.

Under a libel *per quod* theory, there must be a publication or communication knowingly made by the defendant to a third person. The publication must have been intended by defendant to be defamatory and had to be understood as such by those to whom

it was published. For these reasons, both the innuendo and special damages must be proven.

*U v. Duke Univ.*, 91 N.C. App. 171, 181, 371 S.E.2d 701, 708 (citations omitted), *disc. review denied*, 323 N.C. 629, 374 S.E.2d 590 (1988). Even considering "innuendo, colloquium, and explanatory circumstances" we again conclude that none of Parker's publications are defamatory, but rather simply assertions that none of the defendants are affiliated with plaintiff and that none of the defendants nor their close friends endorse plaintiff's book. *Craven* at 736, 656 S.E.2d at 732. These arguments are overruled.

D. Tortious Interference with Business Relationships

**[4]** Plaintiff next "sues for interference with three types of contracts: book sales; literary agents; and eBay auction contracts. . . . ."

The elements of a tortious interference with contract action are:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Holroyd v. Montgomery Cty.*, 167 N.C. App. 539, 546, 606 S.E.2d 353, 358 (2004) (citation and quotation marks omitted), *cert. and disc. review denied*, 359 N.C. 631, 613 S.E.2d 690 (2005).

As to contracts for "book sales" and "literary agents," plaintiff's complaint fails on the first element, the existence of a valid contract. *See id.* Plaintiff has not alleged the existence of any contracts, but merely her hope of future contracts. Even when we assume, *Craven* at 816, 656 S.E.2d at 731, that plaintiff had one contract with a literary agent as she claims, though her complaint did not even identify the name of any such literary agent nor any specific contractual agreement, plaintiff failed to allege that any of the defendants had actual knowledge of the contract or intentionally induced the literary agent not to perform. *See Haywood* at 546, 606 S.E.2d at 358.

Lastly, plaintiff claims that defendants interfered with her sales on eBay. Even if plaintiff at some time had a valid contractual agreement as a seller with eBay, plaintiff's complaint specifically alleges that she was *illegally* selling Mr. Aikens' DVDs and CDS on eBay in violation of federal copyright laws. Plaintiff's own complaint demon-

strates that it was plaintiff's illegal sales over eBay, and not any interference on the part of defendants, which caused eBay to suspend her account. Furthermore, plaintiff could have had only a hope or expectation of future book sales through eBay, as here again she did not allege the existence of a valid contract with any buyer which was formed through eBay. *See id.* These arguments are overruled.

E. Intentional Infliction of Emotional Distress

**[5]** Plaintiff next brings a cause of action for intentional infliction of emotional distress. "The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Denning-Boyles v. WCES, Inc.*, 123 N.C. App. 409, 412-13, 473 S.E.2d 38, 40-41 (1996) (citations and quotation marks omitted). Plaintiff has alleged no actions on the part of any of the defendants which we can identify as "extreme and outrageous[,]" *see Smith-Price v. Charter Behavioral Health Systems*, 164 N.C. App. 349, 354, 595 S.E.2d 778, 782 (2004) (citation and quotation marks omitted) ("Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."), or that this Court would conclude were intended to cause severe emotional distress.

Furthermore, plaintiff has failed to make any specific allegations as the nature of her "severe emotional distress." *See Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (noting that in the context of negligent infliction of emotional distress "the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."); *see also Ramsey v. Harman*, 191 N.C. App. 146, 150, 661 S.E.2d 924, 926-27 (2008) (noting that the definition in *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97, of "severe emotional distress" also applies to intentional infliction of emotional distress). We conclude that plaintiff has failed to allege a claim for intentional infliction of emotional distress. This argument is overruled.

F. Negligent Infliction of Emotional Distress

Plaintiff next brings a cause of action against defendants for negligent infliction of emotional distress. Plaintiff argues that "Aiken has derivative liability for negligence predicated on the tortious behavior

of Parker (for libel and intentional infliction of emotion[al] distress), Wilson (for intentional infliction of emotional distress) and his bodyguard, Jerome (for two batteries)." We take this to mean that plaintiff is claiming that the alleged libel and/or battery somehow resulted from negligence by Mr. Aiken.

"To make out a claim for negligent infliction of emotional distress, a plaintiff must . . . [allege] that the defendant was negligent, that it was foreseeable to the defendant that his negligence would cause the plaintiff severe emotional distress, and that the conduct, in fact, caused severe emotional distress." *Fox-Kirk v. Hannon*, 142 N.C. App. 267, 273, 542 S.E.2d 346, 352 (citation omitted), *disc. review denied and dismissed*, 353 N.C. 725, 551 S.E.2d 437 (2001). We find no factual allegations of negligence in the complaint. *Guthrie v. Conroy*, 152 N.C. App. 15, 25, 567 S.E.2d 403, 410 (2002) (citation omitted) ("Negligence is the breach of a legal duty owed by defendant that proximately causes injury to plaintiff."). In addition, plaintiff does not make any specific factual allegations as to her "severe emotional distress." See Johnson at 304, 395 S.E.2d at 97. This argument is overruled.

G. Injunctive Relief

[6] Plaintiff next requests this Court grant her injunctive relief ordering:

> Defendants to retract the defamatory statements . . . [, and] Aiken to place, either retractions from Aiken, Parker and Wilson, or a positive endorsement by Aiken of *Out of the Blue*, permanently on his official website with a photograph of the cover of the book and with a hyperlink to Plaintiff's website, and to allow and cooperate with a positive endorsement by Aiken, with his photograph, to be placed on Plaintiff's website and to place a positive endorsement on the back cover of *Out of the Blue*, and to write a positive Introduction to be included in *Out of the Blue* thanking the fans and Plaintiff for writing *Out of the Blue*; and ordering that Aiken, Parker and Wilson shall encourage, request, and allow the McGhees to publicly endorse *Out of the Blue*, including, but not limited to, having any or all of their names on the cover of the book or writing a positive comment for book; and any other injunctive relief that the Court deems just and proper.

As to plaintiff's request that defendants retract their defamatory statements, we concluded above that none of defendants' statements

were defamatory, and thus this request is meritless. Plaintiff's lengthy second request is for a mandatory injunction requiring defendants, in several ways, to endorse and promote plaintiff's book. However, a mandatory injunction cannot be granted for this purpose. *See Roberts v. Madison County Realtors Assn., Inc.*, 344 N.C. 394, 399-400, 474 S.E.2d 783, 787 (1996).

> Injunctions may be granted to prevent violation of rights or to restore the plaintiff to rights that have already been violated. No general principle limits injunctive relief to any particular kind of case or constellation of facts.

> Injunctions are denied in particular cases when the plaintiff fails to establish any underlying right. . . .

> . . . .

> [Mandatory injunctions] are affirmative in character, and require positive action involving a change of existing conditions—the doing or undoing of an act.

*Roberts* at 399-400, 474 S.E.2d at 787 (citations and ellipses omitted). Here we do not conclude that any of plaintiff's rights have been violated, and thus injunctive relief would not be proper. This argument is without merit.

H. Battery

[7] Plaintiff argues that Mr. Aiken's employee, Jerome, committed a battery upon her, at Mr. Aiken's specific direction and in his presence. We note that defendants' brief did not address the plaintiff's claims or arguments regarding battery. Plaintiff brought two causes of action for battery based upon the following allegations:

151. On February 25, 2005, as soon as Aiken saw Plaintiff, it was evident to others that Aiken knew who Plaintiff was; Aiken immediately spoke to his very large, bodyguard and employee, Jerome;

152. On February 25, 2005, immediately after Aiken spoke to him, Jerome walked up to Plaintiff, and, upon information and belief, acting with the instructions of Aiken, who had the right to control the manner in which Jerome performed the details of his job, within the scope of his employment, in furtherance of Aiken's business as an entertainer, and as a means or method of performing his job duties, Jerome inten-

tionally and offensively touched or grabbed Plaintiff by her arm, without her consent, and yanked her out of the chair she was sitting in, and Jerome told Plaintiff that she was not going to be sitting there and directed her to stand behind the chairs, without any justification or legal excuse or privilege;

. . . .

155. On February 25, 2005, after Plaintiff sat back down in the chair, upon information and belief, acting with the instructions of Aiken, who had the right to control the manner in which Jerome performed the details of his job, and within the scope of his employment, in furtherance of Aiken's business as an entertainer, and as a means or method of performing his job duties, Jerome intentionally and offensively touched and grabbed Plaintiff by her arm, without her consent, and pulled her out of the chair she was sitting in again, without her consent, and sternly told her she could not sit there and forced her to stand behind the chairs rather than to sit in one, without any justification or legal excuse or privilege;

. . . .

157. Jerome's touchings of Plaintiff were offensive and harmful as he physically caused her pain and he left finger marks on her arm;

Plaintiff has alleged that Jerome, Aiken's employee, unlawfully touched her and that Mr. Aiken directed him to do so.

"A 'battery' is the offensive touching of the person of another without his/her consent . . . ." *City of Greenville v. Haywood*, 130 N.C. App. 271, 275, 502 S.E.2d 430, 433, *disc. review denied*, 349 N.C. 354, 525 S.E.2d 449 (1998).

Under the doctrine of *respondeat superior*, a principal is liable for the torts of its agent which are committed within the scope of the agent's authority, when the principal retains the right to control and direct the manner in which the agent works. Of course, *respondeat superior* does not apply unless an agency relationship of this nature exists.

*Phillips v. Restaurant Mgmt. of Carolina, L.P.*, 146 N.C. App. 203, 216, 552 S.E.2d 686, 695 (2001) (citation omitted), *disc. review denied*, 355 N.C. 214, 560 S.E.2d 132 (2002). "An agency relationship

arises when parties manifest consent that one shall act on behalf of the other and subject to his control." *See id.* (citation and quotation marks omitted).

Plaintiff has pled a claim for relief for battery as she has alleged .that an offensive touching occurred without her consent. *See Haywood* at 275, 502 S.E.2d at 433. Furthermore, plaintiff has alleged Mr. Aiken is liable for the battery upon the theory of vicarious liability as she alleged Mr. Aiken, as Jerome's employer, "had the right to control the manner in which Jerome performed the details of his job, within the scope of his employment, in furtherance of Aiken's business as an entertainer, and as a means or method of performing his job duties . . . ." *See Phillips at* 216, 552 S.E.2d at 695. She has also made factual allegations to support this claim. Thus, we conclude that plaintiff has sufficiently pled a claim for relief for battery against Mr. Aiken.

1. Other Defendants

**[8]** Plaintiff further claims "[d]efendants, BAF and, upon information and belief, the Fifty2thirty Corporations, are vicariously liable for the batteries upon Plaintiff by Jerome as Aiken was acting within the scope of his duties for and in furtherance of the business of BAF[.]" However, plaintiff has not alleged sufficient facts to support plaintiff's conclusory allegation. *See Acosta v. Byrum,* 180 N.C. App. 562, 567, 638 S.E.2d 246, 250 (2006) (citation omitted) ("When analyzing a 12(b)(6) motion, the court is to take all factual allegations as true, but should not presume legal conclusions to be true."); *see also Wiseman Mortuary, Inc. v. Burrell,* 185 N.C. App. 693, 697, 649 S.E.2d 439, 442 (2007) (citation and quotation marks omitted) ("A 'conclusion of law' is a statement of the law arising on the specific facts of a case which determines the issues between the parties.") Plaintiff has not pled any facts which would indicate that "Aiken was acting within the scope of his duties for and in furtherance of the business of BAF[,]" rather than merely acting on his own behalf. As we conclude that plaintiff did not plead sufficient facts that Mr. Aiken was acting "within the scope of . . . [his] authority[,]" BAF and the Fifty2Corporations cannot be held vicariously liable upon a theory of *respondent superior. See Phillips* at 216, 552 S.E.2d at 695.

2. Alter Ego

**[9]** Plaintiff further alleges that the various corporate defendants are ."alter egos" of Mr. Aiken.

HOLLEMAN v. AIKEN

[193 N.C. App. 484 (2008)]

Plaintiff alleged in her complaint that

11. Upon information and belief, as shown by the names and number of the Fifty2thirty Corporations, Aiken has excessively fragmented a single business enterprise into separate corporations, which, upon information and belief, are all affiliated companies with Aiken having complete control of the policies and business practices of each company;

. . . .

26. Upon information and belief, Fifty2thirty Corporations are merely alter egos for Aiken, that he uses to run his performing business enterprise and to insulate himself from liability, in that at all times relevant to the causes of action in the instant Complaint:

a. Aiken had complete domination over the policies and business practices of the Fifty2thirty Corporations;

b. Aiken used the Fifty2thirty Corporations to commit wrong and unjust acts against Plaintiff's legal rights as set forth hereinbelow; and

c. Aiken used his control over the Fifty2thirty Corporations to assist himself in committing Aiken's wrongful acts complained of hereinbelow;

27. The Court should pierce the corporate veils and hold Fifty2thirty Corporations jointly and severally liable for all actions of Aiken and his agents[.]

Thus plaintiff claims that this Court should hold the Fifty2thirty Corporations liable for the actions of Mr. Aiken and/or his agents.

We have been unable to discern any logical basis for plaintiff's "alter ego" claim. We also note that plaintiff's argument in her brief, in its entirety, is:

The factual allegations made in Ms. Holleman's Amended Complaint and the reasonable inferences therein, are sufficient to withstand Defendants' Motion to Dismiss on the issue of the claims against Bubel-Aiken Foundation ("BAF") and all the Fifty2Thirty Corporations, including enough to show that each of the latter is merely the alter ego of Aiken. (R. pp. 115-19).

Plaintiff failed to cite any legal authority in support of her argument. It is therefore deemed abandoned, pursuant to North Carolina Rule of Appellate Procedure 28(b)(6). *See* N.C.R. App. P. 28(b)(6).

3. Punitive Damages

**[10]** As to the claims of relief for battery, plaintiff asserts that she is entitled to punitive damages.

> (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>
> (1) Fraud.
>
> (2) Malice.
>
> (3) Willful or wanton conduct.
>
> . . . .
>
> (c) Punitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another. Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages . . . .

N.C. Gen. Stat. § 1D-15(a), (c) (2005).

" 'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. § 1D-5(7) (2005). Liberally construing plaintiff's verified amended complaint, *Craven* at 816, 656 S.E.2d at 731, we conclude that plaintiff has sufficiently pled Mr. Aiken acted with "willful or wanton" conduct and that he "participated in the conduct constituting the aggravating factor giving rise to the punitive damages[,]" and thus plaintiff has validly pled a claim for punitive damages, only as to the battery claims for relief. *See* N.C. Gen. Stat. §§ 1D-5(7), -15(a), (c). Thus, we conclude that plaintiff has sufficiently pled a claim for relief for two counts of battery solely as to Mr. Aiken. As we have already denied plaintiff injunctive relief, she has stated claims as to Mr. Aiken which are not

subject to dismissal only for compensatory and punitive damages on the battery claims for relief.

## I. Civil Conspiracy

**[11]** Plaintiff also alleges a claim for civil conspiracy. Plaintiff's argument, in its entirety, in support of her civil conspiracy claim is that

> Ms. Holleman's Amended Complaint is replete with allegations of fact, not conclusions, that support Ms. Holleman's Civil Conspiracy cause of action. (R. pp. 130, 133-34, 136, 147-48, 154-56, 163-64, 166, 169-70). Ms. Holleman does allege that Aiken was a conspirator and does say which defendants entered into a conspiracy: Aiken, Parker and Wilson. (R. pp. 130, 133-34, 136, 147-48, 154-56, 163-64, 166, 169-70).

We must differ with plaintiff's characterization of her complaint, as we instead find it to be replete with conclusions and seriously lacking in relevant factual allegations. However, once again, plaintiff has cited no legal authority in support of her argument, and pursuant to North Carolina Rule of Appellate Procedure 28(b)(6), it is deemed abandoned. *See* N.C.R. App. P. 28(b)(6).

### III. Conclusion[4]

We conclude that plaintiff failed to plead sufficient facts for all of her alleged claims for relief except for battery as to Mr. Aiken. Thus, we reverse the trial court order dismissing plaintiff's two claims for relief for battery as to Mr. Aiken for compensatory and punitive damages. As to all of plaintiff's other claims and as to all other parties, we affirm the trial court's order allowing defendants' motion to dismiss.

AFFIRMED IN PART AND REVERSED IN PART.

Judges McGEE and McCULLOUGH concur.

---

4. We need not address plaintiff's remaining two briefed arguments regarding vicarious liability and the alter ego theory as these were addressed within our analysis of plaintiff's claims for relief for battery.