*203 DIAZ, Circuit Judge,
dissenting in part:
I agree that the district court correctly granted summary judgment in favor of Gaston County on Abigail Wilson’s FMLA and ADA claims. But because a reasonable jury could conclude that the County (1) knew that Wilson was being sexually harassed by her co-worker Jim Putman and yet did nothing, or (2) reasonably should have anticipated that (based on his prior behavior) Putman would sexually harass Wilson and failed to prevent it, I would vacate the district court’s grant of summary judgment to the County on Wilson’s Title VII hostile work environment claim and her state law tort claims. I therefore respectfully dissent from Parts III.A and III.C of the majority opinion.
I.
We review a district court’s grant of summary judgment de novo. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001). Summary judgment is appropriate only if the movant—here, Gaston County—shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). “A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.” Id. at 568 (internal quotation marks omitted). And “[a] fact is material if it might affect the outcome of the suit under the governing law.” Id. (internal quotation marks omitted).
“[A] ‘judge’s function’ at summary judgment is not ‘to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.’ ” Tolan v. Cotton, — U.S. —, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). “When reviewing a grant of summary judgment, we view all reasonable inferences drawn from the evidence in the light that is most favorable to” Wilson, as the non-moving party. Smith v. Munday, 848 F.3d 248, 251 (4th Cir. 2017) (internal quotation marks omitted). Critically, “[sjummary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.” Jacobs, 780 F.3d at 568.
The court’s decision today contravenes our limited and well established role at the summary judgment stage of identifying genuine disputes suitable for trial. By discrediting Wilson’s competent evidence and resolving factual disputes in favor of the County, the majority—as the district court did—impermissibly transforms “a motion designed simply for identifying trial-worthy issues” into “a vehicle for resolving trial-worthy issues.” Id. at 569 n.8 (quoting Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 NYU L. Rev. 286, 312 (2013)).
II.
Wilson’s Title VII hostile work environment claim turns on whether the County had notice of Putman’s sexual harassment of Wilson before March 2012, when the County’s Human Resources department conducted an investigation into the matter, substantiated Wilson’s claim of harassment, and recommended that Putman be disciplined. Because Putman was Wilson’s coworker, and not her supervisor, his actions are imputable to the County only if it “knew or should have known about the harassment and failed to take effective action to stop it.” Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 334 (4th Cir. 2003) (en banc). Under this standard for *204 assessing coworker sexual harassment, “[knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment.” Id. (internal quotation marks and alterations omitted).
In my view, a reasonable jury could conclude that Wilson repeatedly put her supervisors on notice about Putman’s sexual harassment before March 2012, and yet they failed to take effective action to stop it. And separately, a reasonable jury could conclude that Jessica Spurrier’s October 2011 report to those supervisors about Putman’s earlier behavior toward her placed the County on notice of Putman’s penchant for sexually harassing conduct.
A.
Since filing suit, Wilson has steadfastly maintained that she reported Putman’s sexual harassment to her supervisors before March 2012, shortly after the harassment began in November 2011. In her first amended complaint, Wilson alleged that in response to these reports, “Adams and McConnell ... told [Wilson] that they would handle the matter ‘internally’ and discouraged her from going to Human Resources.” J.A. 15.
Wilson provided additional detail about these reports in her August 2014 deposition, explaining that she reported Put-man’s misconduct to either Adams or McConnell between November 2011 and January 2012. According to her testimony, Wilson first approached Adams about Put-man’s sexual harassment in late November 2011. Wilson expressed to Adams her wish that Adams “would just do better” to keep Putman and Wilson separated, explaining,
[Putman]’s not leaving when he’s posting. He’s sitting. He’s waiting on me. He’s still aggravating me and texting me. Just, you know, stop posting him down there. Post somebody else.
J.A. 522-23, 525. Wilson subsequently approached McConnell in December 2011 to report the incident during which Putman pulled Wilson from an ambulance, pinned her against the vehicle, and groped her breasts, pelvic area, and genitals while Wilson repeatedly told him to stop. According to Wilson,
I told [McConnell] about the incident down there where [Putman] groped me and left a bruise on my leg.
J.A. 525.
As the majority recounts, in January 2012, Putman walked up behind Wilson during a work shift and slapped her buttocks so hard that Tina Beheler, a fellow paramedic present during the incident, “heard the pop [slap] and saw the swing.” J.A. 247. Wilson again approached Adams after this second incident, stating,
You know, I’ve had two incidents now where [Putman]’s left bruises on me that I’m having to explain to my husband. My husband wants to come down here. I’m getting text messages all the time. I want him to leave me alone.
J.A. 523. Wilson further testified,
I told [Adams] about, the continued text messaging. I couldn’t be at the hospital at the same time that Mr. Putman was at the hospital without him coming straight for me and touching me, putting his arm around me, pulling my hair, what—you know, what have you. I said, you know, “It’s getting to the point of being aggravating. I’m having to lock the ambulance doors anytime he’s around because he’ll come and open my door and stand in it and—and all sorts of other things.” I said, you know, ‘You all need to do something.”
*205 J.A. 526. During this meeting, Wilson also told Adams that Putman had sent her two pictures of his genitals via text message.
After each report, Adams and McConnell invariably responded that they would “handle it internally” and “take care of it.” J.A. 522, 526, 605-06. Adams also told Wilson that she need not bring Putman’s harassment to the attention of Chief Mark Lamphiear, and McConnell discouraged her from going to Human Resources.
My colleagues touch only briefly upon this deposition testimony, instead anchoring their holding on the statements signed by Wilson in connection with the March 2012 Human Resources investigation wherein, says the majority, Wilson admits that she had not reported the harassment.
To be sure, our court adheres to the “long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts.” Spriggs, 242 F.3d at 185 n.7 (citing Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970 (4th Cir. 1990)). We first recognized this rule—often referred to as the “sham affidavit” doctrine—in Barwick v. Celotex Corp., 736 F.2d 946 (4th Cir. 1984). See Stevenson v. City of Seat Pleasant, 743 F.3d 411, 422 (4th Cir. 2014) (“This Court has previously referred to bogus affidavits submitted in opposition to summary judgment for the purpose of creating disputes of material fact as ‘sham’ affidavits.”).
Application of the doctrine deters litigants attempting to generate issues of fact to avoid summary judgment from submitting a conclusory affidavit that contradicts prior deposition testimony. Central to its application is the principle that a party’s deposition testimony “will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.” Perma Research & Dev. Co. v. Singer Co., 410 F.2d 672, 578 (2d Cir. 1969) (internal quotation marks omitted); see also Rohrbough, 916 F.2d at 975 (“If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.” (quoting Barwick, 736 F.2d at 960)).
Here, however, the majority has chosen to treat Wilson’s statements to Human Resources as gospel over her later deposition testimony. Moreover, for the rule to apply “there must be a bona fide inconsistency” in the party’s account of the facts. Spriggs, 242 F.3d at 185 n.7. Drawing all reasonable inferences in Wilson’s favor, I discern no “bona fide inconsistency” between the statements Wilson provided during the March 2012 Human Resources investigation and her later sworn testimony that she reported Putman’s sexual harassment to her superiors as early as November 2011.
To begin with, the written statements are not necessarily inconsistent with Wilson’s later deposition testimony: Wilson never states that she did not report Put-man to Adams or McConnell or solely reported Putman’s harassment to her peers. Moreover, a jury could find entirely reasonable Wilson’s explanation that the statements merely reflect her hesitancy to escalate the matter by reporting it to Human Resources, particularly since, as she alleges, her supervisors discouraged her from doing so.
Common sense and context also support that conclusion. Human resources departments are normally separate entities from an employee’s everyday chain of command. Gaston County’s sexual-harassment policy *206 and' training materials reflect this distinction, instructing employees who witness sexual harassment to report misconduct to their supervisors or alternatively to the Human Resources Director. An employee could reasonably view bypassing her superiors and bringing a complaint of sexual harassment to Human Resources to be a discrete, more serious form of complaint. Further, Wilson wrote the statement and signed the typed summary during the Human Resources investigation into Putman’s harassment, at the urging of Amia Massey, Human Resources Coordinator. In this light, it’s not unreasonable to conclude that when Wilson expressed regret in the March 2012 statements for belatedly filing a “complaint of this nature” or “making this type of complaint,” she was referring only to her failure to bring Putman’s harassment to the attention of the Human Resources Department. Supp. J.A. 11 (emphasis added).
In sum, while a reasonable juror could reject Wilson’s explanation as to the alleged discrepancies in the handwritten and typed statements and her testimony, a reasonable juror could also accept it. In light of Wilson’s detailed deposition testimony regarding her multiple reports to her supervisors, I cannot agree that, as a matter of law, the record evidence compels a conclusion that Wilson failed to inform her supervisors about Putman’s sexual harassment before March 2012.
B.
In any event, if more were required to place Gaston County on notice about Put-man’s sexually harassing behavior, Jessica Spurrier’s testimony detailing Putman’s unwanted sexual advance and her subsequent report to Adams and McConnell is itself sufficient to create a jury question as to the County’s constructive notice of Put-man’s deplorable behavior.
Spurrier, a fellow paramedic, was twice assigned to ride with Putman in Fall 2011. On those occasions, Putman “messed” with Spurrier by poking and tickling her while they sat together in a parked ambulance. J.A. 91. Spurrier testified in her deposition about an incident that occurred prior to October 2011, stating,
[Putman] was in the driver’s seat; I was in the passenger seat. He repeatedly would reach over, trying to poke and tickle. He was repeatedly told to stop. He then came around to the side of the truck, the passenger side where I was sitting typing a report. He continued the behavior of trying to touch and grab at my sides, bringing himself uncomfortably close to my face, to a point at which I kind of had to punch him in the stomach because he was not listening to the word “no.”
J.A. 138. Spurrier described the incident in further detail, testifying that despite telling Putman to stop “[a]t least two or three” times, Putman “startle[d] [her] when he opened the door” of the passenger side and continued “grabbing at [her] sides, poking, trying to tickle, and ... continued getting closer to [her] face.” J.A. 139, 142-43. As Spurrier pushed back and told Putman to stop, Putman pulled her toward him to kiss her, stopping only when she punched him in the stomach.
Spurrier reported this incident to her operational supervisors—Adams and McConnell. Spurrier told one or both of them that she did not want to ride with Putman again, explaining, “I said that he got in my personal space, tickling me, that I was uncomfortable, I didn’t want to do it again.” J.A. 146. Spurrier also told Adams and/or McConnell that Putman had attempted unwelcome physical contact with her, refused to listen to her when she told him repeatedly to stop, and “got the point across” that she had to subdue Putman *207 with a punch to stop his unwanted advance. J.A. 147. According to Spurrier, her report “wasn’t made a big deal” and she was never partnered with Putman again. J.A. 147.
I cannot agree with the colleagues that this troubling incident was “more annoying than anything,” and thereby insufficient to put Gaston County on notice about Put-man’s sexually harassing behaviors. Op. at 16 (quoting J.A. 91-92). Like the district court, the majority adopts Spurrier’s characterization of the incident in her affidavit, ignoring Spurrier’s more detailed deposition testimony stating that Putman’s behavior made her “completely uncomfortable” and “would have never been said [to be] okay.” J.A. 148,151.
Regardless, the determination of whether unwelcome, sex-based conduct is sufficiently severe as to amount to sexual harassment is an objective one; viewed “from the perspective of a reasonable person in the [victim’s] position.” Okoli v. City of Balt., 648 F.3d 216, 222 (4th Cir. 2011) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). By adhering to this objective standard, we avoid allowing a victim’s subjective perceptions—which can downplay or exaggerate an incident— to govern harassment claims.
“[E]mployers have an affirmative duty to prevent sexual harassment, and will be liable if they anticipated or reasonably should have anticipated that a particular employee would sexually harass a particular coworker and yet failed to take action reasonably calculated to prevent such harassment.” Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 255 (4th Cir. 2015) (internal quotation marks omitted); see also Paroline v. Unisys Corp., 879 F.2d 100, 107 (4th Cir. 1989) (“Prevention is generally more efficacious than cure.”), rev’d in part on other grounds, 900 F.2d 27 (4th Cir. 1990) (en banc) (per curiam). The appropriate inquiry then is whether the County should have reasonably anticipated, on the basis of Spurrier’s report to Adams and/or McConnell, that Putman would have sexually harassed another female coworker. In my view, a reasonable juror could so conclude. As we have explained,
An employer’s knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee’s harassing conduct.... Of course, an employer’s knowledge of previous incidents of sexual harassment of other female workers will not necessarily indicate that an employer should have anticipated the plaintiffs harassment as well. But that is generally an issue for the fact finder, not one for disposal on summary judgment.
Paroline, 879 F.2d at 107 (internal citations omitted).
That Spurrier only requested that she not be partnered with Putman in the future did not relieve her employer of its affirmative duty to prevent future sexual harassment by Putman. Indeed, “[i]n certain circumstances, an employer, whose tepid response to valid complaints of sexual harassment emboldens would-be offenders, may be liable if a vigorous response would have prevented the abuse.” Alexander v. Alcatel NA Cable Sys., 50 Fed.Appx. 594, 602 (4th Cir. 2002).
The incident reported by Spurrier bears striking similarities to Putman’s harassment of Wilson. Putman tickled, poked, and grabbed both women, and made unwanted sexual advances toward them during work hours, while alone with them in an ambulance. And, critically, Spurrier no *208 tified her supervisors about this behavior. On this evidence, I cannot conclude as a matter of law that Spurrier's report to her supervisors failed to place Gaston County-on notice that Putman would—absent a swift response—likely harass another female coworker.
III.
Wilson’s state law tort claims of battery and intentional infliction of emotional distress (“IIED”) likewise turn on whether the County had adequate notice of Put-man’s sexually harassing behavior prior to March 2012. For reasons I’ve explained, the record evidence, properly construed, supports Wilson’s assertion that the County had knowledge of all material facts and circumstances surrounding Putman’s conduct before March 2012. As such, a reasonable jury could conclude that the County “ratified” Putman’s intentional torts when it failed to act to correct his behavior. See Brown v. Burlington Indus., Inc., 98 N.C.App. 431, 378 S.E.2d 232, 235-36 (1989).*
In support of its finding that the County lacked “knowledge of all of the material facts surrounding a battery Putman committed at any time before March 2012,” the district court concluded that Wilson’s reports to Adams that Putman was “sending [her] home with bruises” and to McConnell that Putman “left a bruise on her,” were insufficient to convey that Put-man had committed a battery. J.A. 108. Even absent the reasonable inference that Wilson reported to McConnell the specific details of the December 2011 incident during which Putman groped Wilson against an ambulance, it strains credulity to conclude—on the basis of these comments— that Adams and McConnell were unaware that Putman had committed a non-consensual “offensive touching of’ Wilson. See Holleman v. Aiken, 193 N.C.App. 484, 668 S.E.2d 579, 592 (2008).
The district court also entered judgment for the County on Wilson’s IIED claim for lack of notice, finding that Wilson’s reports to her supervisors did not sufficiently convey that she was experiencing extreme emotional distress. But Wilson reported to Adams and McConnell that Putman subjected her to non-consensual sexual touching, constant suggestive remarks, and graphic text messages. Wilson also told Adams that she had taken to locking herself in the ambulance to avoid further harassment from Putman. Under North Carolina law, such conduct could be regarded by a jury to be “beyond the bounds usually tolerated by decent society.” Hogan, 340 S.E.2d at 121 (internal quotation marks omitted). Summary judgment on Wilson’s intentional infliction of emotional distress claim was therefore improper. See Wilson v. Bellamy, 105 N.C.App. 446, 414 S.E.2d 347, 359 (1992) (“[O]nce conduct is shown which may be reasonably regarded as extreme and outrageous, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outra *209 geous to result in liability.” (quoting Brown, 378 S.E.2d at 235)).
[[Image here]]
For the reasons given, I respectfully dissent from Parts III.A and III.C of the majority opinion.

 Similarly, the County's actual notice of Put-man’s tendency to engage in sexually harassing and tortious conduct towards other female coworkers prior to Putman’s harassment of Wilson satisfies the notice element of Wilson’s state law claim for negligent retention and supervision. See Medlin v. Bass, 327 N.C. 587, 398 S.E.2d 460, 462 (1990). Construing the record evidence in Wilson's favor, a reasonable jury could conclude that, given its knowledge of Putman's prior, similar tortious conduct, the County was negligent in its retention and supervision of Putman. See Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 340 S.E.2d 116, 124-25 (1986). Accordingly, I would vacate the district court’s entry of summary judgment against Wilson as to her negligent retention and supervision claim.