**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-2212**

CHRISTINA LYNN JACOBS,

                    Plaintiff - Appellant,

          v.

N.C. ADMINISTRATIVE OFFICE OF THE COURTS; JAN KENNEDY, in
her official capacity as New Hanover County Clerk of
Superior Court,

                    Defendants – Appellees,

          and

BRENDA TUCKER, New Hanover County Clerk of Superior Court;
MELISSA GRIFFIN; DEBRA EXCELL,

                    Defendants.

-------------------------

THE NATIONAL DISABILITY RIGHTS NETWORK; NATIONAL ALLIANCE ON
MENTAL ILLNESS NORTH CAROLINA; THE BAZELON CENTER FOR MENTAL
HEALTH LAW; MENTAL HEALTH AMERICA; NATIONAL ALLIANCE ON
MENTAL ILLNESS,

                    Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Wilmington.  Terrence W. Boyle,
District Judge. (7:11-cv-00169-BO)

Argued:  December 9, 2014          Decided:  March 12, 2015

Before KEENAN, FLOYD, and HARRIS, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Floyd wrote the opinion, in which Judge Keenan and Judge Harris joined.

---

**ARGUED**: Vanessa Katherine Lucas, EDELSTEIN & PAYNE, Raleigh, North Carolina, for Appellant. Kathryn Hicks Shields, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF**: Lisa Grafstein, Mercedes Restucha-Klem, DISABILITY RIGHTS NORTH CAROLINA, Raleigh, North Carolina, for Appellant. Roy Cooper, North Carolina Attorney General, Grady L. Balentine, Jr., Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. Brian East, DISABILITY RIGHTS TEXAS, Austin, Texas, for Amici Curiae.

---

2

FLOYD, Circuit Judge

Christina Jacobs worked as a deputy clerk at a courthouse in New Hanover County, North Carolina. Although she allegedly suffered from social anxiety disorder, her employer assigned her to provide customer service at the courthouse front counter. Believing that her mental illness hindered her ability to perform this inherently social task, Jacobs requested an accommodation--to be assigned to a role with less direct interpersonal interaction. Her employer waited three weeks without acting on her request and then terminated her.

Jacobs brought suit against her employer under the Americans with Disabilities Act (ADA). The district court granted summary judgment to the employer on all counts. Because the district court erred by resolving disputed facts in favor of the movant and for the reasons that follow, we reverse the grant of summary judgment in part and remand for trial.

I.

Christina Jacobs has suffered from mental illness since childhood.[1] At ten, Jacobs was diagnosed with severe situational

---

[1] In reviewing de novo the district court's order granting summary judgment to the North Carolina Administrative Office of the Courts, we "view the facts and all justifiable inferences arising therefrom in the light most favorable to" Jacobs, as the nonmoving party. Libertarian Party of Va. v. Judd, 718 F.3d

performance anxiety. At twelve, she was hospitalized for several days after threatening harm to herself and others. During her hospitalization she was diagnosed with mood disorder and selective mutism, and prescribed antidepressants. At the age of 18, she received an additional diagnosis of social anxiety disorder for which she has been treated intermittently by several physicians.

Social anxiety disorder is characterized by a "marked and persistent fear of . . . social or performance situations in which [a] person is exposed to unfamiliar people or to possible scrutiny by others." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 456 (4th ed. 2000) [hereinafter DSM-IV].[2] A person suffering from social anxiety disorder either "avoid[s]" the feared social or performance situations, or "endure[s them] with intense anxiety or distress." Id. A person can only be diagnosed with social anxiety disorder when the "avoidance, anxious anticipation, or distress in the feared social or performance situation(s) interferes significantly with the person's normal routine, occupational . . . functioning, or social activities or

308, 312 (4th Cir. 2013). The following statement of facts conforms to this standard.

[2] We take judicial notice of the DSM-IV (and not the current DSM-V) because the expert witnesses in this case applied the diagnostic criteria of the DSM-IV. Fed. R. Evid. 201.

4

relationships . . . ." <u>Id.</u> The American Psychiatric Association (APA) notes that social anxiety disorder can create a "vicious cycle of anticipatory anxiety leading to fearful cognition and anxiety . . . , which leads to actual or perceived poor performance . . . , which leads to embarrassment and increased anticipatory anxiety . . . ." <u>Id.</u> at 451. "A job promotion to a position requiring public speaking may result in the emergence of [social anxiety disorder] in someone who previously never needed to speak in public." <u>Id.</u> at 453.

In January 2009, Jacobs was hired by Brenda Tucker, the elected clerk of court, as an office assistant in the criminal division of the North Carolina Administrative Office of the Courts (AOC). As an office assistant, Jacobs's job duties included microfilming and filing. Less than a month after Jacobs started working, Tucker promoted her to the position of deputy clerk.[3]

At the time of Jacobs's employment, 30 total deputy clerks worked in the criminal division. Four or five of the deputy clerks provided customer service at the division's front counter. The remaining deputy clerks performed other filing and record-keeping tasks, many of which do not require face-to-face

---

[3] It is undisputed that at the time of her promotion Jacobs met or exceeded the minimum eligibility requirements for the position.

interaction with the public.[4] AOC supervisors typically assigned the most junior deputy clerks to the front counter. However, all deputy clerks--regardless of assignment and seniority--had the same title and job description.

In March 2009, Jacobs began training to work at the front counter. She was assigned to work four days a week at the front counter and one day a week microfilming. Jacobs soon began to experience extreme stress, nervousness, and panic attacks while working at the front counter. She became particularly panicked when she was asked a question to which she did not immediately know the answer--a common occurrence when working behind the counter. She attributed these symptoms to her diagnosed social anxiety disorder.

On or about May 5, 2009, Jacobs went to a supervisor, Debra Excell, and told Excell that she had social anxiety disorder and was not feeling healthy while working at the front counter. Jacobs told Excell that she had received treatment (including medication) for mental health issues while in college, but that she was not currently under a doctor's care. Excell encouraged Jacobs to seek treatment from the doctor who had helped her in

---

[4] For example, disposition and continuance clerks work primarily on the computer and do not provide direct customer service.

college. After her meeting with Excell, Jacobs went to a doctor and began receiving treatment for anxiety and depression.

Excell subsequently told Tucker about her conversation with Jacobs. Tucker took handwritten notes on Excell's oral account of her conversation with Jacobs, which included the phrases "too stressful," "nerve issues," "anxiety disorder," and "might have to go back to [the doctor]." J.A. 823. Tucker's assistant placed the notes in Jacobs's personnel file.

During the course of her employment, Jacobs was never written up for any disciplinary infraction or performance issue. There are no notes in her personnel file indicating any problems with her performance. Yet the AOC now alleges, inter alia, that Jacobs was a slow worker, impermissibly disclosed information to members of the public, and had outbursts with coworkers and supervisors. The AOC has produced no documentary evidence (such as e-mails) corroborating these allegations.

On September 8, 2009, Jacobs sent an e-mail to her three immediate supervisors (Excell, Jan Kennedy, and Melissa Griffin) in which she disclosed her disability for a second time and requested an accommodation. Specifically, Jacobs requested that she be "trained to fill a different role in the Clerk's Office and perhaps work at the front counter only once a week." J.A. 798. The next day, Jacobs followed up in person with Kennedy. Kennedy told Jacobs that only Tucker had the power to act on

7

Jacobs's request and, because Tucker was currently on a three-week vacation, Jacobs would have to wait until Tucker returned. Soon after her meeting with Kennedy, Jacobs forwarded her e-mail request to Tucker.

While she was waiting for Tucker to return and address her accommodation request, Jacobs sought to use some accrued leave. Kennedy questioned Jacobs about why she wanted leave and denied her request. Jacobs's previous leave requests were not questioned and had always been approved.

Tucker alleges that while she was on vacation, she did not check her e-mail and asked to be called only in the event of an emergency. She allegedly received a call from her assistant, Alice Radewicz, informing her that Jacobs had been spotted sleeping at her desk. Tucker testified that this was the only call she received during her three-week absence.

Upon returning to the office on September 29, 2009, Tucker called Jacobs into her office for a meeting. Excell, Kennedy, and Griffin were already in Tucker's office when Jacobs arrived, where they had just concluded a meeting regarding Jacobs. Jacobs also saw a copy of her e-mail requesting an accommodation on Tucker's desk, annotated in someone's handwriting. Tucker later testified that she had written the notes on the e-mail printout. Jacobs assumed that the meeting was about her request

8

for an accommodation and recorded the meeting on a small personal audio recorder.

Jacobs told Tucker that she had wanted to meet regarding "just what the e-mail said."[5]  J.A. 827.  Tucker did not inquire as to what e-mail Jacobs was referring.  Instead, she told Jacobs that she was being fired because she was not "getting it" and Tucker did not "have any place [that she could] use [Jacobs's] services."  Id.  She did not mention Jacobs's alleged sleeping on the job.  When Jacobs asked Tucker whether she was being fired "because of the e-mail," Tucker responded that "it doesn't have anything to do with the e-mail."  Id.

After her termination, Jacobs timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).  During the EEOC investigation, Tucker denied that she knew of Jacobs's disability and that she had read the e-mail before deciding to terminate Jacobs.  After Jacobs received a favorable determination from the EEOC, the Department of Justice issued a Right to Sue letter.

Jacobs then timely filed suit against the AOC and against Jan Kennedy (Tucker's successor) in her official capacity as clerk of court.  Jacobs's amended complaint alleges five causes

---

[5]  All quotations are to Jacobs's recording of the termination meeting on page 827 of the joint appendix, and not to Jacobs's transcription of the recording.

of action,[6] three of which are pertinent to this appeal: (i) disability discrimination under the ADA; (ii) failure to provide a reasonable accommodation under the ADA; and (iii) retaliation under the ADA.[7] The district court had jurisdiction pursuant to 28 U.S.C. § 1331.

In a brief opinion, the district court granted the AOC's motion for summary judgment. Jacobs v. N.C. Admin. Office of the Courts, No. 7:11-CV-169-BO, 2013 WL 4736171, at *1 (E.D.N.C. Sept. 3, 2013). Although the AOC conceded for summary-judgment purposes that Jacobs had a disability, the district court found that Jacobs was not disabled as a matter of law and that she had

---

[6] Jacobs's complaint also alleged that the AOC committed a per se violation of the ADA by commingling her medical records with her personnel file. The district court granted summary judgment because the ostensible "medical records" were voluntarily provided by Jacobs. Jacobs does not appeal the grant of summary judgment on this claim, and we therefore save the question of whether the ADA's confidentiality provisions apply to the voluntary disclosure of disability for another day.

[7] Jacobs purports to appeal two other causes of action: discrimination and retaliation under Section 504 of the Rehabilitation Act (29 U.S.C. § 794); and wrongful discharge in violation of North Carolina public policy. However, Jacobs failed to discuss these claims (except in passing) in the argument section of her opening brief, contrary to the requirement of Rule 28(a)(8)(A) of the Federal Rules of Appellate Procedure that the brief contain "appellant's contentions and the reasons for them." Specifically, she did not challenge the district court's finding that "stating a claim under the Rehabilitation Act is more difficult" than under the ADA. J.A. 1039. We therefore find that Jacobs has abandoned these claims on appeal. Sandlands C & D LLC v. Cnty. of Horry, 737 F.3d 45, 51 n.4 (4th Cir. 2013); Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

10

therefore failed to establish a prima facie case of disability discrimination and failure to grant a reasonable accommodation. Id. at *3. The district court also found that there was no evidence in the record that Tucker knew of Jacobs's request for an accommodation at the time she decided to fire Jacobs, and that Jacobs therefore failed to establish a prima facie case of retaliation. Id.

The district court entered judgment against Jacobs on September 3, 2013. Jacobs timely appealed. We have jurisdiction over final judgments of the district court pursuant to 28 U.S.C. § 1291.

## II.

### A.

Ordinarily we would begin our discussion with a brief restatement of the standard of review for a motion for summary judgment. When "the opinion below reflects a clear misapprehension of summary judgment standards," however, further elaboration is warranted. Tolan v. Cotton, 134 S. Ct. 1861, 1868 (2014) (per curiam). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving

11

party.'"  Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the district court must "view the evidence 'in the light most favorable to the'" nonmoving party.  Tolan, 134 S. Ct. at 1866 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."  10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998).[8]  The court therefore cannot weigh the evidence or make credibility determinations.  Mercantile Peninsula Bank v. French (In re French), 499 F.3d 345, 352 (4th Cir. 2007) (citing Anderson, 477 U.S. at 255); see also Fed. R. Civ. P. 56 Advisory Committee's Note (1963) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in

_____

[8]  As Professor Arthur Miller noted recently, "a motion designed simply for identifying trial-worthy issues has become, on occasion, a vehicle for resolving trial-worthy issues." Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 312 (2013).

12

order to evaluate their credibility, summary judgment is not appropriate.").

The Supreme Court recently granted certiorari and issued a decision in a seemingly routine summary judgment case because the lower court had "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." Tolan, 134 S. Ct. at 1866 (brackets omitted) (quoting Anderson, 477 U.S. at 249). Specifically, the court of appeals (affirming the district court) repeatedly failed to credit the testimony of the plaintiff and members of his immediate family, which often contradicted the court's statement of the "central facts" of the case. Id. at 1866-67. Because the court of appeals "weigh[ed] the evidence and reach[ed] factual inferences contrary to [the nonmovant's] competent evidence," the Supreme Court vacated the court's affirmance of the district court's grant of summary judgment. Id. at 1868.

B.

In this case, as in Tolan, the district court erred by failing to consider all of the evidence in the record. The district court's opinion also states the facts in the light most favorable to the AOC--not Jacobs, the nonmovant. Strikingly,

13

both of the district court's key factual findings--that Jacobs was not disabled and that Tucker did not learn of Jacobs's accommodation request prior to terminating her--rest on factual inferences contrary to Jacobs's competent evidence. The district court thus improperly resolved factual issues at the summary judgment stage, in contravention of well-settled law. We discuss these errors in turn.

1.

We begin by noting several examples of the district court's misapplication of the summary judgment standard in its recitation of the facts.

First, the district court stated that Jacobs "had what was described as a 'melt-down' with a co-worker . . . [that] caused a disruption in the office . . . ." J.A. 1034. However, the co-worker allegedly involved in the outburst denied that it ever occurred. The AOC witnesses who testified regarding the alleged outburst did not directly witness it and could not recall how they had learned about it.

Second, the district court accepted the AOC's characterization of Jacobs's May 5 meeting with Excell: "[T]he plaintiff told Debra Excell that she was having <u>social issues</u> and was nervous about working at the front counter." <u>Id.</u> (emphasis added). Jacobs testified that she told Excell she had

14

social anxiety disorder--not mere "social issues." Tucker's handwritten notes on her conversation with Excell regarding this meeting, in which she wrote the words "anxiety disorder," support Jacobs's account of the conversation.

Third, the district court stated as an undisputed fact that Jacobs "did not tell anyone she was disabled" in April or May of 2009. Id. This is inconsistent with the testimony of Jacobs, Excell, and Tucker, who all agreed that Jacobs told Excell she had anxiety issues that were impacting her work and for which she had received medical treatment in the past.

Fourth and finally, the district court adopted the AOC's erroneous contention that its expert witness failed to examine Jacobs because Jacobs did not consent to be examined. See J.A. 1035 ("[T]his was done in lieu of examining the plaintiff personally because she refused to submit to such an evaluation." (emphasis added)). As the record makes clear, the AOC never brought a motion for mental examination under Rule 35 of the Federal Rules of Civil Procedure and did not respond to the offer by Jacobs's counsel to proceed with such an examination without motion.

Considering the order in its entirety, we conclude that the district court impermissibly "credited the evidence of the party seeking summary judgment and failed properly to acknowledge key

15

evidence offered by the party opposing that motion." Tolan, 134 S. Ct. at 1867–68. This was error.

2.

The district court also erred by concluding that Jacobs was not disabled within the meaning of the ADA. During the course of discovery both parties produced expert testimony by mental health specialists on this issue. After examining Jacobs, forensic psychologist Dr. Claudia Coleman concluded that "her mental disorders, Social Phobia and Anxiety Disorder, . . . constitute a disability as defined by the [ADA]." J.A. 807. Forensic psychiatrist Dr. George Corvin, the AOC's expert, did not examine Jacobs. Instead, Dr. Corvin based his report on a review of her medical records, social media use, employment records, and the report of a private investigator who observed Jacobs while she was at work at a new job. Dr. Corvin concluded that it was possible that Jacobs met the diagnostic criteria for social anxiety disorder but that "her medical records alone are insufficient to establish such a diagnosis." J.A. 222. He also determined from the private investigator's report that Jacobs was currently succeeding in a new customer service job, and thereby inferred that she had not experienced "any significant level of anxiety or other psychiatric impairment" while working at the AOC. Id.

16

The district court determined from "Dr. Corvin's report and the plaintiff's behavior [at] work" that Jacobs was not disabled. J.A. 1038. Inexplicably, the district court omits any mention of Dr. Coleman's conflicting report. Additionally, Dr. Corvin's report simply does not support the district court's finding of no disability--rather, Dr. Corvin concluded only that Jacobs's medical records were equivocal on this question.

As in Tolan, the district court "neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." 134 S. Ct. at 1868. Rather, the court incorrectly drew all inferences in favor of the AOC, not Jacobs. We therefore reverse the district court's determination that there is no genuine dispute as to whether Jacobs had a disability.

3.

The district court also determined that "there is no evidence that Ms. Tucker knew that the plaintiff had requested an accommodation at the time she made the decision to terminate her." J.A. 1038 (emphasis added). This finding has no basis in the record.

Rather, the record taken in the light most favorable to Jacobs demonstrates just the opposite. It is undisputed that Jacobs e-mailed her request for an accommodation to Tucker on

17

September 9, 2009. Jacobs also e-mailed her request to her immediate supervisors, and discussed her request in person with Kennedy. Kennedy told Jacobs that she could not act on Jacobs's request without discussing it first with Tucker. Upon returning to the office on September 29, Tucker held a meeting with Jacobs's immediate supervisors--Kennedy, Excell, and Griffin. Kennedy testified that the supervisors discussed Jacobs during this meeting. Tucker then called Jacobs into the meeting, and summarily fired her in front of Kennedy, Excell, and Griffin. A reasonable jury could infer from these facts that before Jacobs walked in, any or all of Jacobs's supervisors would have discussed the accommodation request e-mail.

The record taken in the light most favorable to Jacobs also demonstrates that Tucker read the e-mail before firing Jacobs. When Jacobs entered Tucker's office she saw an annotated copy of her request for accommodation sitting on Tucker's desk. Tucker admits to having annotated the e-mail but testified that she did so only after the meeting. Tucker cannot remember when she printed the e-mail but testified that it may have been during the meeting and that she first read the e-mail during the meeting. This account is inconsistent with the audio recording of the meeting, which a reasonable jury could find does not contain any pauses long enough to account for Tucker finding and

18

printing the e-mail. A reasonable jury could credit Jacobs's testimony over Tucker's on this factual question.

Finally, Tucker's statements during the termination meeting indicate that she knew about Jacobs's accommodation request. At the beginning of the meeting, Jacobs said she wanted to discuss "just what the e-mail said." J.A. 827. Tucker did not ask to what e-mail Jacobs was referring. Instead, Tucker told Jacobs that, at the time of her hiring, Jacobs "expressed [she] would be able to handle all of that [i.e., front counter work], that it wouldn't be problematic for you." Id. Tucker added, "I don't have any place that I can use your services." Id. If Tucker had called the meeting without knowledge of the accommodation request, it is unlikely that she would have addressed the possibility of reassigning Jacobs. Moreover, when Jacobs asked whether she was being fired "because of the e-mail," Tucker responded that "it doesn't have anything to do with the e-mail." Id. If Tucker were truly unaware of the contents of the e-mail, it is unlikely that she would have answered the question in this way.

A reasonable jury could infer from Jacobs's, Tucker's, and Kennedy's testimony and from the recording of the conversation that Tucker knew about Jacobs's accommodation request at the time she decided to terminate Jacobs. Accordingly, we reverse the district court's determination to the contrary.

19

III.

Merely concluding that disputed issues of fact exist as to whether Jacobs was disabled and whether Tucker knew about her accommodation request does not end our inquiry.  Rather, we must also decide whether disputed issues of fact exist as to elements of each of Jacobs's three claims: (i) disability discrimination; (ii) retaliation; and (iii) failure to provide a reasonable accommodation.  We address each claim in turn.

A.

We first consider whether we should affirm summary judgment on Jacobs's disability discrimination claim.

To establish a claim for disability discrimination under the ADA, a plaintiff must prove "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000).  Disability discrimination may be proven through direct and indirect evidence or through the McDonnell Douglas burden-shifting framework.[9]  See Raytheon Co. v. Hernandez, 540 U.S. 44, 49–50 & n.3 (2003).

---

[9]  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

The AOC argues that Jacobs did not have a disability as a matter of law. [10] "Disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA provides a nonexhaustive list of major life activities, including "speaking," "concentrating," "thinking," "communicating," and "working." Id. § 12102(2)(A). The EEOC has also identified "interacting with others" as a major life activity. 29 C.F.R. § 1630.2(i)(1)(i).

"In September 2008, Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 . . . ." Summers v. Altarum Inst., Corp., 740 F.3d 325, 329 (4th Cir. 2014). The ADA Amendments Act (ADAAA) was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." Id. "[T]he

---

[10] As noted above, this argument is inconsistent with AOC's prior litigation position. J.A. 1027 ("For the sake of summary judgment, Defendants have conceded that Plaintiff had a disability.").

21

question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub. L. No. 110-325, § 2(b)(5) (2008). In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw. Summers, 740 F.3d at 331.

Jacobs alleges that her social anxiety disorder substantially limited her ability to interact with others and was therefore a disability. The AOC first argues that no evidence in the record shows that Jacobs was suffering from social anxiety disorder while employed as a deputy clerk. This is clearly incorrect. As discussed above, the testimony of Dr. Coleman suffices to establish a genuine dispute of fact on this question.

The AOC next argues that Jacobs's social anxiety disorder did not substantially limit any major life activity because "interacting with others" is not a major life activity. This argument constitutes a challenge to the EEOC's interpretation of the ADA. See 29 C.F.R. § 1630.2(i)(1)(i) (identifying "interacting with others" as a major life activity). We therefore apply the familiar two-step Chevron analysis.[11] See Jones v. Am. Postal Workers Union, 192 F.3d 417, 427 (4th Cir.

---

[11] Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

22

1999) (affording Chevron deference to the EEOC's interpretation of a Title VII provision expressly adopted by the ADA).

Under Chevron, we first ask whether Congress has "directly spoken" to the precise question of whether interacting with others is a major life activity. Summers, 740 F.3d at 331. By its express language, the statute's list of major life activities is not exhaustive. 42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited to . . . ." (emphasis added)). We therefore conclude that Congress has deliberately left a gap for the agency to fill, and proceed to Chevron's second step--determining whether the EEOC's regulation is reasonable. Summers, 740 F.3d at 331-32.

"The stated goal of the ADAAA is to expand the scope of protection available under the Act as broadly as the text permits." Id. at 332. A major life activity is one that is "of central importance to daily life." Toyota Motor Mfg., Ky. Inc. v. Williams, 534 U.S. 184, 197 (2002) (abrogated in part by the ADAAA). Few activities are more central to the human condition than interacting with others. If "bending" and "lifting" are major life activities, 42 U.S.C. § 12102(2)(A), it is certainly reasonable for the EEOC to conclude that interacting with others falls in the same category. Identifying "interacting with others" as a major life activity comparable to "caring for oneself," "speaking," "learning," and "communicating" advances

23

the broad remedial purpose of the ADA. We therefore defer to the EEOC's determination and hold that interacting with others is a major life activity.

The AOC also argues that Jacobs has failed to show that her alleged social anxiety disorder substantially limited her ability to interact with others. Prior to the ADAAA, a plaintiff seeking to prove disability needed to show that she was "significantly restricted" in a major life activity. See, e.g., Pollard v. High's of Balt., Inc., 281 F.3d 462, 467 (4th Cir. 2002). The ADAAA expressly rejected this rule as imposing "too high a standard." Pub. L. No. 110-325 § 2(a)(8). The regulations define a substantially limiting impairment as one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).[12] "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Id.

The AOC argues that Jacobs could not have been substantially limited in interacting with others because she

---

[12] Because both parties accept the EEOC regulations as instructive, we assume without deciding that they are reasonable and have no occasion to decide what level of deference, if any, they are due. See Toyota, 534 U.S. at 194; Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 255 n.1 (4th Cir. 2006).

24

"interact[ed] with others on a daily basis," "routinely answered inquiries from the public at the front counter," "socialized with her co-workers outside of work," and engaged in social interaction on Facebook. Appellees' Br. at 26, 29. The AOC misapprehends both the meaning of "substantially limits" and the nature of social anxiety disorder.

A person need not live as a hermit in order to be "substantially limited" in interacting with others. According to the APA, a person with social anxiety disorder will either avoid social situations <u>or</u> "endure the social or performance situation . . . with intense anxiety." <u>DSM-IV</u>, <u>supra</u>, at 451.[13] Thus, the fact that Jacobs may have endured social situations does not per se preclude a finding that she had social anxiety disorder. Rather, Jacobs need only show she endured these situations "with intense anxiety." <u>Id.</u> At a minimum, Jacobs's testimony that working the front counter caused her extreme stress and panic attacks creates a disputed issue of fact on this issue.[14] Her testimony is also consistent with

---

[13] We also note in passing that if Jacobs in fact took longer than necessary to complete her microfilming work and procrastinated in returning to the front desk (as the AOC alleges), this may constitute avoidant behavior consistent with a diagnosis of social anxiety disorder.

[14] Although members of the public will not experience intense anxiety and panic when asked a question by a stranger, Jacobs alleges that working the front counter caused her extreme stress and panic attacks. According to the DSM-IV, between 3%

25

Dr. Coleman's testimony that Jacobs suffered from social anxiety disorder within the meaning of the DSM-IV.

The undisputed facts that Jacobs spoke to coworkers and attempted to perform her job at the front counter are therefore not fatal to her claim. That she attended several outings with coworkers in her nine months in the office is also hardly dispositive--answering questions at the front counter constitutes a performance situation that is different in character from having lunch with coworkers, and a reasonable jury may conclude that Jacobs's allegedly debilitating anxiety was specific to that situation. Finally, to the extent that Jacobs's Facebook activity constitutes a "mitigating measure" (that is, a form of exposure therapy by which Jacobs attempted to overcome her anxiety through social interaction that was not face-to-face and not in real time) we are not permitted to consider it in determining the existence of a substantial limitation on her ability to interact with others. 42 U.S.C. § 12102(4)(E)(i). We therefore find that a reasonable jury

---

and 13% of people will experience social anxiety disorder at some point in their life. DSM-IV, supra, at 453. Just 10% of people who experience a fear of public speaking experience enough impairment or distress to be diagnosed with social anxiety disorder. Id. We therefore conclude that social anxiety disorder limits sufferers "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

could conclude that Jacobs was substantially limited in her ability to interact with others and thus disabled within the meaning of the ADA.

## 2.

We turn next to the second element of the prima facie case: whether Jacobs has shown that she was a qualified individual for the employment in question. The AOC argues that no reasonable jury could find that, at the time of her discharge, Jacobs was "performing her job at a level that met her employer's legitimate expectations." See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58, 61–62 (4th Cir. 1995) (finding that summary judgment was appropriate when an employee had received numerous negative performance evaluations and written reprimands over three years, was suspended for poor performance, and conceded that she was not a model employee and made too many personal phone calls). The AOC supports this argument with considerable testimony regarding Jacobs's shortcomings as an employee.

Jacobs responds by denying these allegations and noting that she was promoted to the position of deputy clerk after only a month on the job. She further argues that she never received a negative performance review, evaluation, or written warning, and that the AOC's testimony could be discredited at trial as

27

inconsistent and contradictory. Cf. EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (holding that an employer's provision of shifting and inconsistent justifications for taking an adverse employment action "is, in and of itself, probative of pretext"). For example, AOC witnesses testified that Ashley English, an AOC employee, told them about Jacobs's performance issues and inappropriate outbursts. English, however, testified that she never discussed Jacobs's performance with the AOC witnesses and that Jacobs never had an inappropriate outburst. From these inconsistencies and the total lack of documentary evidence of Jacobs's alleged poor performance, a reasonable jury could conclude that Jacobs was qualified for the position of deputy clerk.

3.

Disputed issues of material fact also exist as to the third element of the prima facie case--causation. The AOC argues that Jacobs cannot prove causation because no reasonable jury could find that Tucker knew of Jacobs's disability at the time Jacobs was terminated. We disagree.

First, the note Tucker placed in Jacobs's personnel file demonstrates that Tucker was aware as early as May 5, 2009 (more than three months before the termination) that Jacobs had "nerve issues," an "anxiety disorder," and that she "might have to go

28

back to [the doctor]." J.A. 823. Second, just before firing Jacobs, Tucker met with the three supervisors who had received Jacobs's e-mailed accommodation request. One of these supervisors told Jacobs that she intended to discuss the request with Tucker upon Tucker's return from vacation. Drawing all reasonable inferences in Jacobs's favor, Tucker and the supervisors likely discussed Jacobs's disability at this meeting immediately before firing her. A reasonable jury could thus find that Tucker knew that Jacobs was disabled. See Schmidt v. Safeway Inc., 864 F. Supp. 991, 997 (D. Or. 1994) ("The employer need only know the underlying facts, not the legal significance of those facts.").

Contrary to the AOC's contention, Jacobs has produced affirmative evidence from which a reasonable jury could conclude that she was terminated because of her disability. See Ennis, 53 F.3d at 59. She was fired just three weeks after sending her e-mail disclosing her disability and requesting an accommodation. Such close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation. See Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity alone can create a genuine dispute to causation).

29

We therefore find that a reasonable jury could conclude that Jacobs has made out each of the elements of a prima facie case of discriminatory discharge.

4.

Under the familiar McDonnell Douglas framework, the burden then shifts to the AOC to produce evidence of a legitimate, non-discriminatory reason for terminating Jacobs. See McDonnell Douglas Corp., 411 U.S. at 802. The AOC produced evidence of a number of non-discriminatory reasons for Jacobs's termination including: Jacobs was not "getting it"; she had outbursts and became angry with her trainer; she slept on the job; and she failed to follow the appropriate procedure for calling in sick. For summary judgment purposes, we thus find that the AOC has satisfied this relatively modest burden.

The burden therefore shifts back to Jacobs to prove that these asserted justifications are pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). Among other methods, she may do so by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation. Dennis v. Columbia Colleton Med. Ctr. , Inc., 290 F.3d 639, 647 (4th Cir. 2002). Jacobs argues that the AOC's proffered reasons are pretextual because: (i) the AOC has offered different rationales

30

at different phases of the litigation and (ii) the AOC's evidence is inconsistent and contradictory.

The fact that an employer "has offered different justifications at different times for [an adverse employment action] is, in and of itself, probative of pretext." Sears Roebuck & Co., 243 F.3d at 852–53. At the time of termination, Tucker told Jacobs that she was being fired for not "getting it," for being slow, for lying about her ability to do the job, and for her "propensity for mistakes." J.A. 827. In her EEOC complaint, Tucker put forward additional reasons: Jacobs had "outbursts," got angry with her trainer, and would disruptively ask her co-workers how to perform tasks. J.A. 686. After Jacobs filed suit, the AOC put forward still more reasons, claiming that Jacobs slept on the job and failed to follow procedures for calling in sick.

Although this constellation of justifications is not internally inconsistent, many of the purported justifications were not raised at the time of termination. Even more striking is that no one at the AOC documented any of the justifications (including those raised at the time of termination) in any way. Moreover, all of the annotations on the e-mail printout (that Tucker testified reflect her contemporaneous account of the reasons for firing Jacobs) concern her disability, use of sick leave, and request for accommodation; none concern the

31

justifications raised during the course of litigation. Drawing all reasonable inferences in favor of Jacobs, we conclude that the AOC's undocumented and uncorroborated justifications are pretextual and were not the actual reason for Jacobs's termination.[15]

In addition, substantial circumstantial evidence contradicts Tucker's testimony that she decided to fire Jacobs after learning that Jacobs had been sleeping on the job. See Reeves, 530 U.S. at 151 (stating that courts need not credit the moving party's evidence when it is either contradicted or impeached by the nonmoving party). First, even though Jacobs's alleged sleeping was purportedly central to Tucker's decision to fire her, Tucker did not discuss it in the termination meeting or in responding to the EEOC. Rather, the story emerged for the first time during discovery in this suit. Second, Tucker's deposition testimony contains numerous inconsistencies. For example, she testified about a discussion that purportedly took place during the termination meeting, but that discussion is entirely absent from the unaltered audio recording of that

_____

[15] Jacobs also argues that the AOC's evidence regarding the justifications for firing Tucker is self-defeating. Specifically, she notes that although all of Jacobs's supervisors testified that they learned of Jacobs's performance issues from co-worker Ashley English, English testified that she never discussed Jacobs's performance with them. We conclude that English's testimony creates a genuine dispute of fact regarding Jacobs's alleged performance issues.

32

meeting.  See Deville v. Marcantel, 567 F.3d 156, 165 (5th Cir. 2009) (per curiam) ("Summary judgment is not appropriate when 'questions about the credibility of key witnesses loom large' and the evidence could permit the trier-of-fact to treat their testimony with 'skeptical scrutiny.'" (ellipsis omitted) (quoting Thomas v. Great Atl. & Pac. Tea Co., 233 F.3d 326, 331 (5th Cir. 2000))).

Third, Radewicz--who testified that she observed Jacobs sleeping at her desk and called Tucker while she was away on vacation to let her know--also testified that she was coached by Tucker regarding specific details of her testimony on the morning of her deposition.[16]  Fourth and finally, Radewicz's testimony is significantly implausible.  Tucker testified that, while she was on vacation, she asked to be called only in the event of an emergency and that the only call she received was from Radewicz.  In order to credit Tucker and Radewicz, then, a jury would have to believe that the only "emergency" that occurred in the courthouse during Tucker's three-week vacation was Jacobs's purportedly sleeping on the job.  We therefore conclude that Jacobs's circumstantial evidence is sufficient to

---

[16] Jacobs denies ever sleeping on the job, but has not produced evidence directly contradicting Radewicz's testimony that she called Tucker during Tucker's vacation.

create a genuine dispute of fact as to whether she was fired for sleeping on the job.

In sum, we find that a reasonable jury could conclude that Jacobs has set out a prima facie case of disability discrimination and sufficient evidence of pretext to ultimately prevail on her claim. The district court thus erred in granting summary judgment on Jacobs's disability discrimination claim.

## B.

We next consider whether we should affirm summary judgment on Jacobs's retaliatory discharge claim. The ADA provides that "no person shall discriminate against any individual" for engaging in protected opposition or participation activity. 42 U.S.C. § 12203(a). Jacobs alleges that she was fired because she engaged in protected activity; namely, requesting an accommodation for her social anxiety disorder.

"In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir. 2001). A plaintiff need not show that she is disabled within the meaning of the ADA. See id. Whether a plaintiff proceeds by direct evidence or McDonnell Douglas burden-shifting, she must show (i) that she engaged in protected activity and, (ii) because of this,

34

(iii) her employer took an adverse employment action against her. Id.

The parties do not dispute that the first and third elements are satisfied. Jacobs clearly engaged in protected activity by submitting a request for accommodation; and the AOC clearly took an adverse employment action by firing her. As set forth below, disputed issues of material fact exist as to causation under the McDonnell Douglas framework. Accordingly, we reverse the grant of summary judgment as to Jacobs's retaliatory discharge claim.

1.

In assessing causation, we begin with Jacobs's asserted direct and indirect evidence of retaliation. "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." Rhoads, 257 F.3d at 391 (quoting Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999)) (brackets and internal quotation marks omitted). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. at 391–92 (quoting Brinkley, 180 F.3d at 607).

35

First, Jacobs argues that Tucker's refusal to train her for positions other than the front counter, when Tucker had allowed the 29 other deputy clerks to train for positions other than the front counter, is direct evidence that Jacobs was treated adversely because of her request for an accommodation. It is undisputed that the AOC did not provide such training immediately to new hires. Jacobs does not produce any evidence that other deputy clerks of comparable tenure were given training opportunities that she was denied. Accordingly, this argument is without merit.

Second, Jacobs argues that the actions taken by the AOC after she submitted her accommodation request constitute evidence that the AOC reacted to her request with retaliatory animus. For example, although her supervisor had granted all her requests for leave <u>before</u> she sought an accommodation, her request for leave <u>after</u> seeking the accommodation was denied.[17] Jacobs also cites as direct evidence of retaliatory animus a letter Tucker wrote to a superior following the termination in which Tucker said she had reservations about hiring Jacobs due to her "mousiness." J.A. 689.

---

[17] We note that, in addition to serving as evidence of hostility, the denial of leave can itself be an adverse employment action compensable under the ADA's retaliation provision. <u>Wells v. Gates</u>, 336 F. App'x 378, 383–384 (4th Cir. 2009) (per curiam).

36

Considering this evidence as a whole, we find that no reasonable jury could conclude on the basis of the purported direct and indirect evidence that Tucker fired Jacobs in retaliation for her request for accommodation. Although Jacobs provides some indirect evidence from which a factfinder might infer animus, she has produced no direct evidence of retaliatory (as opposed to discriminatory) animus. Tucker's notes and statements during the termination meeting indicate that she may have intended to fire Jacobs because she was disabled, but they do not indicate that she intended to fire Jacobs in retaliation for requesting an accommodation. Jacobs's purported direct and indirect evidence is insufficient to survive summary judgment.

2.

However, this is not the end of our analysis of Jacobs's retaliation claim. We also consider whether Jacobs can survive summary judgment under the McDonnell Douglas burden-shifting framework. Under this method of proof, Jacobs "must show (1) that [s]he engaged in protected activity; (2) that [her] employer took an adverse action against [her]; and (3) that a causal connection existed between the adverse activity and the protected action." Haulbrook, 252 F.3d at 706. "The employer then has the burden 'to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason

37

for its actions.'" Rhoads, 257 F.3d at 392 (quoting Beall v. Abbots Labs., 130 F.3d 614, 619 (4th Cir. 1997)). The burden then shifts back to the plaintiff to show that the proffered reason is pretext. "The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." Id.

Jacobs has established the first two elements of the prima facie case through undisputed evidence. The AOC argues that Jacobs has failed to establish causation because there is "no evidence" that Tucker knew, when she decided to terminate Jacobs, that Jacobs had submitted an accommodation request. Appellees' Br. at 43. As we discussed above, the record in actuality contains ample evidence from which a reasonable jury could conclude that Tucker learned of Jacobs's request for an accommodation before the termination meeting. See supra Part II.B.3. We therefore proceed with the causation inquiry. Jacobs was terminated just three weeks after requesting an accommodation from her supervisors. This close temporal proximity is sufficient to establish a disputed issue of fact as to the causation element of the prima facie case. See Haulbrook, 252 F.3d at 706 ("[A] contested issue of fact arguably exists as to . . . [causation], due solely to the proximity in time of [the plaintiff's] termination on November

38

and his assertion on November 4 of a right to accommodation under the ADA.").

From here, the burden-shifting inquiry proceeds just as it did with respect to Jacobs's disability discrimination claim. For the reasons stated above in Part III.A.4, we find that a reasonable jury could conclude that Jacobs has set out sufficient evidence of pretext to ultimately prevail on her retaliation claim. Thus, the district court erred in granting summary judgment on this claim.

## C.

Finally, we consider whether we should affirm summary judgment on Jacobs's failure-to-accommodate claim. To establish a prima facie case for failure to accommodate, Jacobs must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (brackets and ellipsis omitted). For the reasons discussed above, we find that Jacobs has established a genuine dispute of fact regarding the first and second elements of the prima facie case--that is, that she had a disability and that the AOC had

39

notice of her disability. As to the fourth element, it is undisputed that the AOC refused to make an accommodation for Jacobs. The only remaining issue concerns the third element: Could a reasonable jury find that with a reasonable accommodation, Jacobs could perform the essential functions of the position of deputy clerk?

1.

We start by determining the essential functions of the position of deputy clerk. Not all job requirements or functions are essential. A job function is essential when "the reason the position exists is to perform that function," when there aren't enough employees available to perform the function, or when the function is so specialized that someone is hired specifically because of his or her expertise in performing that function. 29 C.F.R. § 1630.2(n)(2). "[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Other relevant evidence can include "the employer's judgment as to which functions are essential," "the amount of time spent on the job performing the function," "the consequences of not requiring the incumbent to perform the function," and the work experience

40

of people who hold the same or similar job. 29 C.F.R. § 1630.2(n)(3).[18]

We begin with the written job description for the position: "[D]eputy clerks perform a variety of duties including: working in the courtroom, providing customer service, data entry, typing, filing, cash receipting, case file indexing, multi-tasking and the ability to type 35-40 corrected wpm, and various other tasks." J.A. 678. "[P]roviding customer service" is only one of the many duties that deputy clerks might perform.

We also consider the undisputed evidence in the record. The AOC employed 30 deputy clerks. Of these, only four worked regularly at the front counter. The others performed various tasks, including intake, filing, data entry, mailing documents, bookkeeping, and serving as a courtroom clerk. Most new deputy clerks started at the front counter, purportedly because the front counter is where a new employee can "gain the most knowledge of the office." J.A. 434. However, some new deputy clerks started in filing and were permitted to perform that task without first training at the front counter. See J.A. 274 ("The best two places to start are filing and the front counter."). Deputy clerks were trained for other roles based on seniority.

---

[18] Because the parties agree that the regulations are instructive, we again assume their reasonableness and decline to determine what level of deference, if any, they are due.

J.A. 259 ("I worked at the front counter five days a week for over one year before a new deputy clerk was hired and I was moved off the front counter . . . .").

The record contains ample evidence from which a reasonable jury could conclude that working at the front counter was not an essential function of the position of deputy clerk. The job description does not indicate that all deputy clerks were expected to work at the front counter. Fewer than 15% of the office's deputy clerks worked behind the front counter, and some deputy clerks never performed this task. Because most of the deputy clerks were trained to work behind the front counter, many employees were available to perform that function. Finally, the AOC has produced no evidence that mastery of the front desk was essential or that Jacobs's no longer working behind the front counter would negatively impact the office. We therefore find that Jacobs has established a genuine issue of fact regarding whether working behind the front counter is an essential function of the position of deputy clerk.

2.

We now turn to the heart of a claim for failure to accommodate: whether, with a reasonable accommodation, Jacobs could perform the essential functions of the position of deputy clerk. Wilson, 717 F.3d at 345. This inquiry proceeds in two

42

steps. First, was the specific accommodation requested by Jacobs reasonable? Second, had the AOC granted the accommodation, could Jacobs perform the essential functions of the position? Id.

A reasonable accommodation is one that "enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(o)(1)(ii). The statute expressly contemplates that a reasonable accommodation may require "job restructuring." 42 U.S.C. § 12111(9)(B). Jacobs's proposed accommodation was to work fewer days at the counter and more days microfilming or performing other deputy clerk tasks. This proposed accommodation did not require the AOC to increase the workload of Jacobs's coworkers; Jacobs merely asked that her employer change which deputy clerk was assigned to which task. Cf. Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011) (noting that "an accommodation that would require other employees to work harder is unreasonable").[19] A

---

[19] That Jacobs's request would have necessitated a departure from the office's informal seniority system is of no moment. All deputy clerks shared a common job title and description. In the absence of evidence of a formal seniority policy, that Jacobs's proposed accommodation would require shifting a co-worker with more seniority to a less desirable task does not render it inherently unreasonable. Cf. EEOC v. Sara Lee Corp., 237 F.3d 349, 354–355 (4th Cir. 2001) (where company's formal seniority policy which had been in place for 30 years required

reasonable jury could therefore conclude that Jacobs's requested accommodation was reasonable.

An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform <u>all</u> of the essential functions of her position. Jacobs argues that a transfer away from the front desk would eliminate the cause of her social anxiety--having to answer questions from strangers face-to-face all day--and enable her to meet her employer's reasonable expectations. The AOC argues that Jacobs was a poor performer and therefore would have been unable to perform the essential functions of the position even with the accommodation. As we found above, there is a genuine dispute of fact as to whether Jacobs was a poor performer. Even assuming that Jacobs actually microfilmed too slowly and pestered her coworkers by asking for their help, a reasonable jury could conclude that these behaviors were manifestations of Jacobs's performance anxiety and were unlikely to reemerge had the accommodation been granted. There is no uncontradicted evidence that Jacobs's social anxiety disorder interferes with her ability to file or perform other administrative tasks. We therefore conclude that Jacobs has established a genuine dispute as to whether, with a

an employee to switch to a different shift, it was reasonable for the company to enforce the seniority policy).

44

reasonable accommodation, she could have performed all of the essential functions of the position of deputy clerk.

3.

The ADA imposes upon employers a good-faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation." Wilson, 717 F.3d at 346. This duty is triggered when an employee communicates her disability and desire for an accommodation--even if the employee fails to identify a specific, reasonable accommodation. Id. However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position. Id. at 347; see also Deily v. Waste Mgmt. of Allentown, 55 F. App'x 605, 607 (3d Cir. 2003) (citing Shapiro v. Twp. of Lakewood, 292 F.3d 356, 360 (3d Cir. 2002)). Two of our sister circuits have held that failure to "discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action" against a disabled employee is evidence of bad faith. Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014) (citing EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 622 (5th Cir. 2009)).

45

It is undisputed that each of Jacobs's supervisors--Kennedy, Excell, and Griffin--refused to discuss Jacobs's accommodation request with her until Tucker returned to the office. Both Radewicz and Tucker testified that Jacobs's supervisors had authority to reassign employees to other tasks (and therefore to engage in the interactive process with Jacobs). The morning that Tucker returned to the office after a three-week absence, she called Jacobs to her office and fired her without first discussing her accommodation request. From these facts, a reasonable jury could easily conclude that the AOC acted in bad faith by failing to engage in the interactive process with Jacobs.

We therefore conclude that summary judgment is not warranted on Jacobs's failure to accommodate claim.

IV.

For the foregoing reasons, we reverse in part the district court's order granting summary judgment against Jacobs and remand to the district court for trial of her ADA disability discrimination, retaliation, and failure to accommodate claims.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED FOR TRIAL